MAIN, Judge.
On April 3, 2003, Alfonzo Morris was convicted of two counts of capital murder for the intentional killing of Miriam Rochester during the course of a first-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975, and the intentional killing of Miriam Rochester during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala. Code 1975. Following a sentencing hearing, the jury returned an advisory verdict of death, by a vote of 10-2. A sentencing hearing was held before the trial court, and Morris was sentenced to death. Following an automatic appeal to this Court, his conviction and sentence were reversed, and the cause was remanded for further proceedings. Morris v. State, 956 So.2d 431 (Ala.Crim.App.2005). This Court determined that Morris was denied his rights to due process and a fair trial because he was not provided with funds to hire an independent mental-health expert.
On November 26, 2007, a hearing was conducted pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, (2002), to determine whether Morris is mentally retarded and therefore not subject to execution under the Eighth Amendment of the United States Constitution. After hearing the evidence and arguments of counsel, the trial court applied the test set out in Atkins and determined that Morris is not mentally retarded.
On April 7, 2008, Morris was again tried for the two counts of capital murder. The jury was unable to reach a verdict, and the trial court declared a mistrial. A third trial began on May 5, 2008.
The State’s evidence showed that on February 24, 1997, Miriam Rochester, who was 85 years-old, used a walker, and weighed 92 pounds, was beaten to death in her home. Rochester had transformed her home into a duplex and had taken in a boarder, Elizabeth Russell, who was also elderly and in poor health. The two ladies had become friends, and, on the night of the offense, at approximately 9:30 p.m., Rochester telephoned one of Russell’s sons to inform him that Russell had become ill and was being taken to the hospital.
A rescue unit and fire engine arrived at the house at approximately 9:00 p.m. and were shown to Russell by Rochester. The paramedic who was the driver of the rescue unit testified that the “house was very neat and orderly.” (R. 201.) After Russell was assessed and the ambulance called, the paramedic testified that she went outside to check on her truck. She testified that she saw someone “fooling around my rescue unit acting like he was looking in the windows, fooling with the doors.” (R. 203.) She then asked the person if there was a problem and if she could help him. The man, whom she identified in court as Morris, walked up to her and asked what was happening and who was sick; he insisted that he wanted to go inside the house. The paramedic testified that at one point Morris attempted to bypass her and enter the house, but she prevented him from doing so. He told her that “he lived in that area and he knew everybody and he had a right to go in there.” (R. 205.)
Although Morris smelled strongly of alcohol, the paramedic testified that Morris understood what she was telling him and that his responses were appropriate. As the paramedic saw the rescue crew carrying Russell out to the ambulance, she also saw Morris finally turn and walk away. The paramedic thereafter stepped into the ambulance and through the opened back doors of the vehicle saw that Morris had returned. She informed her partner that *337 Morris had been causing trouble previously, and her partner instructed him to leave. The paramedic testified that she saw Morris walk approximately half of a block away as the rescue crew left.
At approximately 10:00 p.m., Russell’s son telephoned Rochester to update her on Russell’s condition. He received a call from his brother about an hour later, informing him that the brother had been to Rochester’s house at his mother’s request and that the door was open and the house appeared to have been ransacked. Both of Russell’s sons then went to the house and without entering determined that the house had been vandalized. They attempted to telephone Rochester and then telephoned the police.
The police and rescue units arrived around midnight, among them the same paramedic who had earlier cared for Russell. She testified that she originally believed that Russell was the deceased. However, because of the number of police officers present, she determined that the death was not believed to be due to natural causes. She informed the officers that she had been called to the house earlier on that night and that the house had not been in disarray. She also told them about Morris’s presence and behavior. She did not know his name at that time but gave the officers his description.
The first officer who had arrived at the scene testified that there were “pry marks” on the door, indicating forced entry. (R. 261.) He took a description from the paramedic of the man who had attempted to gain entry into the house and, after the scene was processed, he left at approximately 4:00 a.m. and resumed his patrol of the area. At approximately 5:00 a.m., he observed a man fitting the description of the person who had earlier attempted to enter Rochester’s house. The man appeared to be intoxicated and was staggering down the middle of the street. The officer asked the man questions and he responded in a “slurred, but logical way.” (R. 265.) The officer determined that it was not safe for the man to continue and arrested him for public intoxication. The officer identified Morris at trial as the man he had arrested. He asked the man if he was carrying any weapons, and he responded that he had a pocketknife in his right front pocket. (R. 267.) He also stated that he had other items in his pockets that he described as “junk.” (R. 267.) The officer stated that the items were pieces of costume jewelry. He also had a couple of pills and a cigarette in his pockets. Morris identified himself as “Anthony Morris” and gave the officer an address for his residence.[1] (R. 270.)
Before the officer left the scene of Morris’s arrest, the paramedic was brought to that location to determine if she could identify him as the man she had seen earlier. The paramedic testified that she was certain that he was the man she had seen earlier at Rochester’s house. (R. 228.) Morris was taken to the administrative building where officers concluded that he was too intoxicated to be interviewed. He was taken to jail for the night and interviewed the following day.
Rochester’s granddaughter and Russell’s son identified some of the jewelry taken from Morris as belonging to the victim and Russell.[2] Blood found on Morris’s shoe was determined to be Roch *338 ester’s and a cigarette butt found in the Rochester’s house contained Morris’s DNA.
Morris testified at trial that he had been drinking on the day of the offense and had gotten into an argument with the man with whom he had been living. He left the house and eventually began gambling with a man known as “Cue Ball.” (R. 433.) He testified that he won a bag of jewelry from “Cue Ball” and that, as he was attempting to gather the jewelry, “Cue Ball” snatched money from him and a fight ensued. He stated that other gamblers got involved in the altercation, because they did not want him to leave since he was winning. Morris stated that he suffered cuts and bruises, as well as a laceration over his eye, in the altercation. He testified that “Cue Ball” threw the jewelry at him and that he picked it up and walked to a Huddle House restaurant for breakfast. He stated that he became belligerent with the waitress because he had been drinking, and he was forced to leave. He also testified that after eating he put a cigarette in his mouth but did not light it.
Morris testified that he then encountered a police officer who indicated that Morris appeared to have been drinking and arrested him for public intoxication. Morris stated that he was taken in the police car “to the scene of a crime in a house” (R. 441), where a woman identified him. (R. 443-444.) While he was standing in front of the police vehicle, he stated that a dog “came from somewhere” and ran around his feet. (R. 444.) He was subsequently taken to the hospital to treat the laceration to his eye and then was taken to the jail.
Because Morris has been sentenced to death, this Court must review the proceedings below for plain error, under Rule 45A, Ala.R.App.P., which states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
This plain-error standard of review has been addressed by this court as follows:
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the ' fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), affd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), affirmed, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). “The standard applicable to plain-error review is a stringent one.... ” Ex parte Perkins, 851 So.2d 453, 455 (Ala.2002), cert. denied, *339 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 55(2003).
Although Morris’s failure to object will not preclude this Court from reviewing an issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
I.
Morris argues that his execution is prohibited by the Eighth Amendment to the United States Constitution because he is mentally retarded. He raises several contentions on appeal to support his argument.
The record indicates that a hearing was held pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and following the presentation of the evidence and arguments of counsel, the trial court concluded that Morris is not mentally retarded. Morris argues that the trial court made a number of factual errors and that it relied on “reasoning foreclosed by the courts” in making its determination. (Morris’s brief, at 29.)
The trial court’s decision is due to be evaluated under an abuse-of-discretion standard. Byrd v. State, [Ms. CR-07-0113, May 1, 2009] — So.3d -, - (Ala.Crim.App.2009) (“ ‘ “ ‘A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.’ ” ’ ”).
The United States Supreme Court in Atkins provided guidelines for determining whether a person is mentally retarded to the extent that he or she should not be executed. However, the Court also held that ultimately the states should establish their own definitions. The Court stated:
“To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Winwriqht, 477 U.S. 399 (1986), with regard to insanity, ‘we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ Id., at 405, 416-417.”
536 U.S. at 317, 122 S.Ct. at 2250. (Footnote omitted).
Alabama has yet to statutorily define mental retardation in the context of determining the sufficiency of an Atkins claim. However, Alabama has defined a mentally retarded person for the purposes of the “Retarded Defendant Act,” § 15-24-1 et seq., Ala.Code 1975, as follows:
“Mentally retarded person. A person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.”
§ 15-24-2(3), Ala.Code 1975.
The Alabama Supreme Court has directed that review of Atkins claims are to be conducted applying the “ ‘most common’ or ‘broadest’ definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally *340 retarded. See, e.g., Ex parte Perkins, 851 So.2d 453, 455-56 (AIa.2002).” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d -, - (Ala.2007). Moreover, in examining the definitions of mental retardation in other states with statutes prohibiting the execution of a mentally retarded person, the Alabama Supreme Court has written:
“Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).[3]
 Similarly, in suggesting guidance for determining whether a defendant is mentally retarded so as to prohibit the defendant’s execution, the Atkins Court discussed clinical definitions of mental retardation and concluded that these definitions “require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.” 536 U.S. at 318, 122 S.Ct. 2242. Further, “[i]mplicit in the definition is that the sub-average intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18.” Smith v. State, — So.3d at -.
Alabama appellate courts have determined that until the Alabama Legislature establishes a definition for mental retardation to be used in determining Atkins claims, Alabama courts will continue to review such claims “on a case-by-case basis and to apply the guidelines that have been judicially developed thus far.” Morrow v. State, 928 So.2d 315, 324 (Ala.Crim.App.2004).
 The burden of proof for a claim that a capital defendant is mentally retarded and therefore may not constitutionally be executed is on the defendant, and he or she must prove this claim by a preponderance of the evidence. Cf. Trawick v. State, 698 So.2d 151 (Ala.Crim.App.1995) (overruling Bass v. State, 585 So.2d 225 (Ala.Crim.App.1991), to the extent it implied that the burden of proving an insanity defense was by a “preponderance of the evidence” rather than by “clear and convincing evidence”).
“ ‘In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.’ Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at -; see Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d - at -(Ala.Crim.App.2007) (opinion on return to fourth remand). ‘ “The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.” ’ Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at - (quoting Atkins v. Commonwealth, [266 Va. 73,] 581 S.E.2d 514, 515 (2003)). As the Ala *341 bama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, ‘which [have] the opportunity to personally observe the witnesses and assess their credibility.’ Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at - (quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] — So.3d -, - (Ala.Crim.App.2006) (Shaw, J., dissenting)(opinion on return to third remand)).”
Byrd v. State, — So.3d at -. See also Jenkins v. State, 972 So.2d 165, 167 (Ala.Crim.App.2005) (“‘Preponderance of the evidence’ is defined as: ‘The greater weight of the evidence, not necessarily established by the greater, number of witnesses testifying to a fact but by evidence that has the most convincing force; superi- or evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.’ Black’s Law Dictionary 1220 (8th ed. 2004).”).
Moreover, if Morris fails to prove even one of the three prongs of the Atkins test by a preponderance of the evidence, he has not satisfied his burden of proof. Smith v. State, — So.3d at-(“All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim.”).
Following this Court’s decision on Morris’s first direct appeal, an Atkins hearing was held to provide him the opportunity to prove by a preponderance of the evidence that he is mentally retarded. Morris presented the testimony of Dr. Allen Shealy, a psychologist, who testified that he had interviewed Morris on two occasions for a period of three hours each time.
As to Morris’s intellectual functioning, he administered the Weehsler Adult Intelligence Scale Edition 3, the Bender-Gestalt with Cantor Interference Procedure, and the Vineland II Adaptive Behavior Scale. He also testified that he interviewed Morris’s two sisters and reviewed a number of Morris’s records, including his prison and school records. He also testified that he reviewed previous psychological reports and testings, as well as records from the Taylor Hardin Secure Medical Facility. Dr. Shealy concluded that Morris was mildly mentally retarded and that he had a full-scale IQ of 50. (Atkins hearing R. 17.) He testified that, chronologically, he reviewed Morris’s first IQ test administered when Morris was six years of age, which had resulted in an IQ score of 73. He also noted that he had considered an IQ test administered in 1999 by Dr. Kimberly Ackerson, finding that Morris had a full scale IQ of 53 and that he was moderately mentally retarded. He testified that he then considered his own findings, as well as the last testing conducted by Dr. Glenn King in October 2007, which Morris scored a full-scale IQ of 41; Dr. King concluded that he was malingering.
As to Morris’s adaptive behavior, Dr. Shealy testified that he first considered the findings of the Alabama Department of Mental Health after it had administered the AAMD Adaptive Behavior Scale in 1999 and had concluded that Morris was moderately retarded. He then considered the test he administered, concluding that Morris was significantly impaired in several areas, particularly in communication. He also found that Morris was impaired in daily living and somewhat in socialization. Most recently, Morris was' given an adaptive behavior scale by Dr. King, who concluded that Morris was functioning at an age of five years and six months, but Dr. King believed that Morris was malingering. Although Dr. Shealy also concluded that Morris may have been malingering, he discounted the importance of this *342 conclusion, because he testified that even the mentally retarded can malinger. Moreover, he stated that because he was in special education classes as a child, the issue of malingering on the more current tests was moot. (Atkins hearing R. 25).
Moreover, Dr. Shealy concluded, based on a statement by the Alabama Department of Mental Health that the reported history information on Morris suggested that his adaptive behavior had been impaired since childhood, as well as on school records, that his mental retardation had manifested before Morris reached age 18.
At the hearing, Morris also presented the testimony of one of his sisters as to his adaptive behavior as a child. She testified that Morris was a slow learner and that he could not manage money or his medicine. She also testified that he did not separate colors before doing the wash, did not clean well, and did not prepare meals. She stated that he had never lived alone that he had never married but had fathered two children.
The State presented the testimony of Wyatt Rhone, a patient-education coordinator at Taylor Hardin Secure Medical Facility. He testified that he had met with Morris several times, both when he was an outpatient and when he was an inpatient. Specifically, he testified that in 2006, Morris was transported from jail to Taylor Hardin, where Rhone met with him six times during a four- to six-week period. Morris’s beginning assessment score was a zero, and at the completion of the six-week course, he was still assessed at zero. Rhone testified that examples of questions on the test are: “[WJho’s the head of the courtroom[?]” (Atkins hearing R. 85.) “Who represents you or talks for you in court, which of course would be your lawyer. Who is it that’s against you in court, which is the D.A.” (Id.) He testified that he found it difficult to believe that Morris would have scored a zero because the questions concerned very basic knowledge, and on certain occasions Morris was able to discuss far more complex matters; he gave as an example a discussion they had had concerning an episode of the television show The Crocodile Hunter.
Approximately 10 to 11 months later, when Morris was an inpatient, Rhone testified that he met with him for 13 30-minute sessions. He gave Morris the same test, and he again scored zero. He also gave Morris a true-false test containing 10 questions and Morris scored a zero, which Rhone stated was “a little unusual.” (Atkins hearing R. 91.) He testified that he administered the true-false test a second time, and Morris answered one question correctly. Rhone concluded that “[i]f he was managing to answer all of them wrong, that was an indication of an intellectual ability to reason that out.” (Atkins hearing R. 92.) Rhone also stated that Morris typically refused to answer multiple-choice questions. He testified that he determined that Morris was malingering.
The State presented the testimony of Vicki Webster, a nurse at the Jefferson County jail, who stated that she had met with Morris at least six times concerning his medical conditions and treatments while he was incarcerated at the jail. She testified that Morris demonstrated familiarity with his medical conditions and recounted his medical history and past medications. He was also able to take advantage of the medical services provided in the jail, as well as to fill out the written medical forms.
Ned Whitehead testified for the State that he was custodian of the records at the Jefferson County jail. He identified a visitors log that indicated, despite Morris’s statement to Dr. Shealy that he had not seen his family and that they may not know where he is, that Morris’s family *343 members had visited him a number of times.
Terry Love, of the Alabama Probation and Parole Office, testified that he had interviewed Morris pursuant to a presen-tence investigative report that had been ordered in 2003. Morris provided the information, such as his parents’ names and the dates they had died, his siblings’ names, and his employment history, including “lawn service self-employed from ‘92 to ‘97, how much he made doing it, hustling, gambling, stealing, sold marijuana, a variety of things he was doing to make a living.” {Atkins hearing R. 112.) He also provided the names and ages of his children. (Atkins hearing R. 114.)
Phillip Russell, of the Birmingham Police Department, testified that he interviewed Morris on the day after his arrest in the present case. He testified that Morris gave him his brother’s, Anthony Morris’s, name, date of birth, and address as his own. He signed his statement using his brother’s name.
A handwriting specialist, Steven Drex-ler, testified for the State that Morris gave a number of writing samples for comparison purposes and that he could determine that the signature on the submitted court documents was that of Morris. He stated, however, that the handwriting in the text of the documents was inconclusive as to the author. Drexler testified that Morris had attempted to alter his handwriting in a number of the samples and that “[i]n particular [in] the extended writings where he was writing paragraph after paragraph after paragraph and maintaining that altered style, in my opinion it would take a great deal of mental fortitude to be able to maintain that style and not resort back to your normal habits.” {Atkins hearing R. 157.) Moreover, Drexler concluded that the reason he could not make a determination concerning the author of the text of the documents was because the “extended writing standard provided to me was not natural writing. And because I am comparing natural writing to unnatural writing, my opinion is I don’t have an opinion, it’s inconclusive.” {Atkins hearing R. 163.)
Finally, the State presented the testimony of Dr. Glenn King, a clinical and forensic psychologist, who interviewed Morris on two occasions at the Jefferson County Detention Facility. He first spoke with Morris on October 3, 2007 and testified that initially Morris indicated that he did not know his Social Security number or his prison-identification number (AIS number). Dr. King testified that “I’ve been interviewing and evaluating death row inmates since about 1991, both in Georgia and Alabama. And Mr. Morris is the first person that’s not known his AIS number.” {Atkins hearing R. 176.) He indicated that he had no relationship with family members and that he did not know their birth dates or ages. He indicated that at the time of his arrest he was living with “some more people, would not identify them.” {Atkins hearing R. 177.) He indicated that he had been involved in odd jobs, including lawn service and steel-mill assembly work and that he had a driver’s license. Dr. King stated that when asked the farthest distance he had driven, he became evasive. He also found that Morris was malingering in his answers as to the current date and his current location. Dr. King testified:
“His thought processes were normal in progress and form. And at the same time, throughout the interview from the early onset, he was, in my opinion, somewhat uncooperative, mildly hostile, didn’t want to be there, clipped in his answers, frequently evasive, not answering questions or frequently saying T don’t know’ to things. And that’s how I would describe his affect as well is that he was *344 somewhat indifferent to the process and at other times he was uncooperative.”
(.Atkins hearing R. 178.)
Dr. King testified that he administered an IQ test to Morris and that his overall score was 41, which placed him “below the lowest one tenth of one percent of the general population.” (Atkins hearing R. 181-82.) He stated that “a lot of Morris’s scores were in the three to five year old range.” {Atkins hearing R. 182.) Dr. King concluded that Morris was “clearly malingering” for a number of reasons. (.Atkins hearing R. 183.) He noted that his IQ scores were “totally inconsistent” with his “general presentation” during the interview, as well as his responses and statements on the videotapes made at the time of the arrest. (Atkins hearing R. 182.) Moreover, some of the questions Morris answered incorrectly could be answered correctly by people who suffer from extreme mental retardation. As examples, Dr. King noted that Morris was shown a picture of a cat with a ball and stated that the picture showed a cat with a kid. He was unable to take four blocks and put them in the shape of a person although a plate showed the design. Even after Dr. King demonstrated the appropriate configuration, Morris was still unable to do so. Dr. King also pointed out the inconsistency in Morris’s inability to count a series of blocks while his achievement test showed that he could add and subtract simple numbers. In the achievement test, Morris was able to read fill-in-the-blank questions but responded with written answers that were obviously incorrect. Morris was unable to spell simple words on his achievement test; however, in contrast, his written requests for health care consultations contained misspelled words but were sophisticated as to syntax and vocabulary.
As to adaptive behavior, Dr. King testified that he tested Morris on the 10 “domains” dealing with the ability to communicate, the ability to use community resources, and functional academics. (Atkins hearing R. 191.) He stated that the range of the scoring was 1 to 19, with the average being 10. As to Morris’s scores, Dr. King testified:
“He scored a three or lower on absolutely everything indicating that he essentially is nonfunctional in all of these areas meaning he’s not able to communicate, not able to use community resources, not able to have any academic abilities, unable to take care of himself, has no conception really of health and safety issues, can’t use leisure activities, can’t even take care of himself in terms of bathe himself, wash himself and that sort of thing, cannot direct himself, and also has no social relationships meaning in almost all of these cases — in five of the subtest scores, he scored one, which is the lowest possible. And his individual answers on some of the items were also absurd.”
(Atkins hearing R. 192.) Among the answers given by Morris were that he was unable to answer the telephone or to cut his meat in order to eat it.
Dr. King also testified that he administered a test to Morris specifically devised to determine if the respondent is malingering — the Test of Memory Malingering. Dr. King found that Morris was malingering based on his scores on that test. He also noted that his previous test scores given by other administrators also indicated that he was malingering; for example, Dr. King noted that the chances of Morris’s having scored a 0 on a 10-question true-false test was 1 in 4,000. He also noted that Dr. Kamal Nagi, a psychiatrist and forensic examiner at Taylor Hardin Secure Medical Facility who had also interviewed Morris, believed that he was malingering.
*345 Ultimately, based on all of the information available to him, Dr. King concluded that Morris functions in the high borderline to low average range of intellectual ability with an IQ possibly in the low 80s. He also found that Morris’s adaptive skills indicated that he could drive and that he was able to support himself by working. Moreover, he noted that the IQ test that he was administered in first grade scored him at 78, “certainly not retarded.” (Atkins hearing R. 202.) Dr. King also noted that he had reviewed Morris’s school records and that there was no indication that Morris was ever in special-education classes. The court confirmed through the attorneys that Dr. Shealy had stated that Morris was in special-education classes based on information from Morris or family members’. (Atkins hearing R. 204.) Dr. King testified that Morris’s school records indicated that he was a slow learner, but that he was rated as average in seventh grade for participation in class discussions and activities; further, although there was a place on the form in the school records on which to indicate any handicaps, none were included for Morris.
On cross-examination, Dr. King stated that he asked Morris .if he had a “jailhouse lawyer” at the Jefferson County jail help him fill out his documents, and Morris responded that he did not. Morris informed him that when he had been at Homewood, he had someone who had helped him on occasion. Dr. King concluded that Morris is not mentally retarded.
Based on the evidence presented at the hearing, the trial court found that Morris was not retarded. Specifically, the court found that, because all the examiners believed that Morris was malingering, they could not establish an accurate IQ score; rather they acknowledged that his actual IQ may be higher than the scores he had received through testing. He also found that Morris was able to adapt and function, referencing his ability to sell drugs and street-savvies. Finally, he found that there was no manifestation of retardation before age 18, stating that he believed that Morris’s school records were more reliable than the accounts given by his family members.
In the present case, Morris has not proved by a preponderance of the evidence that he is mentally retarded, such that the determination by the. trial court, pursuant to the discretion vested in it as the fact finder, should be reversed. As to Morris’s intellectual functioning, the experts all found that he was malingering. Although Dr. Shealy concluded that this fact did not prohibit his finding that Morris is mentally retarded, Dr. King and Wyatt Rhone both found that Morris’s specific instances of malingering indicated that he was not mentally retarded. The trial court was entitled to weigh the conflicting testimony of the .experts and evaluate their testimony. The court did not exceed its discretion in doing so.
While the jury is the fact-finder in reconciling conflicting expert testimony as to mental competency at the time of the offense, the following guidelines are applicable to the trial court’s determination as to conflicting expert testimony as to mental retardation:
“ ‘ “Opinions of experts in the field of mental disorders as to an accused’s sanity or insanity are of course admissible and certainly should be carefully considered by a jury. Such opinion evidence is not, however, conclusive on the jury. The responsibility is upon the jury to weigh all the evidence, expert and lay, pertaining to the issue of the accused’s mental competency. The weight to be accorded all such evidence is solely within the *346 jury’s province. They may reject it all even though it is without conflict.”
“ ‘Fitzhugh v. State, 35 Ala.App. 18, 26, 43 So.2d 831, 838, cert. denied, 253 Ala. 246, 43 So.2d 839 (1949), cert. denied, 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (1950)....
[[Image here]]
“ ‘ “Expert testimony, even when un-contradicted, is not conclusive on the issue of sanity, ... and the jury may find such testimony adequately rebutted by the observations of mere laymen.” [United States v.] Mota, 598 F.2d [995] at 999 [ (5th Cir.1979) ]. See also Greider v. Duckworth, 701 F.2d 1228, 1234 (7th Cir.1983) (“The jury could credit the testimony of lay witnesses over that of an expert witness”); United States v. Emery, 682 F.2d 493, 498 n. 3 (5th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) (“The jury can find expert testimony adequately rebutted by the observations of laymen”).
[[Image here]]
“ ‘Although “a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it,” Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir.1984), “the jury cannot arbitrarily ignore the experts in favor of the observations of laymen,” id., and must have an “objective reason,” to disregard the expert’s opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir.1985).
“ ‘ “In making this judgment [to disregard the expert’s opinion], the court should consider
“ ‘ “(1) the correctness or adequacy of the factual assumptions on which the expert opinions are based;
‘““(2) possible bias in the experts’ appraisal of the defendant’s condition;
‘““(3) inconsistencies in the experts’ testimony, or material variations between experts; and
“ ‘ “(4) the relevance and strength of the contrary lay testimony.
““‘Strickland, 738 F.2d at 1552; Brock [v. United States,] 387 F.2d [254, 258 (5th Cir.1967)] (quoting Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967)).”
“ ‘Wallace v. Kemp, 757 F.2d at 1109.’ “Ellis v. State, 570 So.2d 744, 751-53 (Ala.Cr.App.1990).”
Dunaway v. State, 746 So.2d 1021, 1033 (Ala.Crim.App.1998), affirmed, 746 So.2d 1042 (Ala.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000).
Moreover, Morris did not prove by a preponderance of the evidence that any of the alleged deficits in his adaptive behavior that might indicate retardation had manifested before the age of 18. Although his sisters testified that he could not live alone and that he had always lived with family members, evidence at the hearing in the presentence investigative report indicated that Morris was living with another man at the time of the offense.[4] There was also no indication in Morris’s school records that he attended special-education classes. A review of Morris’s school records, contained in the record on appeal as Defendant’s Exhibit 4, indicates that he was considered to be a slow learner and was described as “mischievous” in elementary *347 school, but was assessed an IQ score of 73. Although he failed courses in 7th and 8th grades, he also made B’s, C’s, and D’s. Because the evidence was conflicting and therefore implicated credibility and weighing choices, this determination is better suited to the trial court. See generally Ex parte Bridgett, 1 So.3d 1057, 1063 (Ala.2008); Denson v. Middleton, 17 Ala.App. 266, 267, 84 So. 473, 474 (1919). There is no indication from the evidence presented that the determination made by the trial court was improper.
As to Morris’s adaptive functioning, although there was evidence indicating that Morris was incapable of living alone and of performing certain basic tasks, this evidence came generally from Morris himself or his sisters. Although Morris’s sister testified that Morris was incapable of taking his temperature or taking medicine, the State presented evidence indicating that Morris sought medical attention in jail when needed and articulately requested his medication or need for treatment.[5] The State also presented evidence that Morris had worked and engaged in drug dealing and gambling. See Smith v. State, — So.3d at-(“ ‘More insightful into Smith’s adaptive behavior is the fact that Smith was involved in an interstate illegal-drug enterprise.’ ”). There was also evidence indicating that Morris worked in lawn care and in assembly work. Cf. Iiol-laday v. Allen, 555 F.3d 1346, 1359 (11th Cir.2009) (Holladay’s jobs included pumping gas “which he had to leave because he could not work the cash register” and a warehouse job that he lost “because other employees were concerned about his inabilities.”). The State presented further evidence indicating that Morris used his brother’s name, address, and date of birth when he was arrested and again in a statement to the police. See Smith v. State, — So.3d at - (Alabama Supreme Court considered the fact that Smith gave a police officer a false name two days before the offense as indicating of a lack of deficits in his adaptive behavior.).
Morris’s specific arguments raised on appeal address conflicts in the evidence, which were properly weighed and evaluated by the trial court as the finder of fact. Therefore, the trial court did no err in determining that Morris is not mentally retarded for purposes of Atkins.
II.
Morris argues that he was improperly sentenced to death because, he says, the trial court failed to consider and to find the existence of several nonstatutory mitigating circumstances, and it impermissibly counted the same aggravating circumstance twice.
A.
Morris contends that the trial court improperly failed to consider the following nonstatutory mitigating evidence: that he had a low level of intelligence; that he had a poor educational history; that he suffered from psychiatric problems; that he had a history of alcohol and drug abuse; that he was intoxicated at the time of the crime; that his parents divorced when he was a teenager; that his father died in a fire when he was a teenager and his mother died four months before the crime for which he was convicted; that the killing of Rochester was not planned because he believed no one was home; that he had adapted to prison life; and that his sister asked for mercy on his behalf. Thus, Morris argues that the trial court’s finding, *348 without explanation in its sentencing order that no nonstatutory mitigating circumstances existed was erroneous.
Morris did not object on this ground at the trial court level; therefore this issue must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
In Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d - (Ala.Crim.App.2009), this Court determined that the trial court’s failure to make specific findings as to each nonstatutory mitigating circumstance in its sentencing order did not constitute plain error. Moreover, as in the present case, the sentencing order addressed all that was required, although it did not list or find any nonstatutory mitigating circumstances. In so holding, we wrote:
“In Ex parte Lewis, 24 So.3d 540 (Ala.2009), the Alabama Supreme Court quoted Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000), concerning a trial court’s duty in considering whether proffered evidence constitutes a mitigating circumstance, stating:
“ ‘ “The sentencing order shows that the trial court considered all of the mitigating evidence offered by Clark. The trial court did not limit or restrict Clark in any way as to the evidence he presented or the arguments he made regarding mitigating circumstances. In its sentencing order, the trial court addressed each statutory mitigating circumstance listed in § 13A-5-51, Ala.Code 1975, and it determined that none of those circumstances existed under the evidence presented. Although the trial court did not list and make findings as to the existence or nonexistence of each nonstatutory mitigating circumstance offered by Clark, as noted above, such a listing is not required, and the trial court’s not making such findings indicates only that the trial court found the offered evidence not to be mitigating, not that the trial court did not consider this evidence. Clearly, the trial court considered Clark’s proffered evidence of mitigation but concluded that the evidence did not rise to the level of a mitigating circumstance. The trial court’s findings in this regard are supported by the record.
“ ‘ “Because it is clear from a review of the entire record that the trial court understood its duty to consider all the mitigating evidence presented by Clark, that the trial court did in fact consider all such evidence, and that the trial court’s findings are supported by the evidence, we find no error, plain or otherwise, in the trial court’s findings regarding the statutory and nonstatutory mitigating circumstances.”
“ ‘896 So.2d at 652-53 (emphasis added).’
“24 So.3d at 545.
“Here, it is clear that the trial court considered all of the evidence offered and made proper findings as to what evidence constituted nonstatutory mitigating circumstances. ‘ “[T]he trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.” Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Al.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ Brown v. State, 11 So.3d 866, 932 (Ala.Crim.App.2007), affirmed, Ex parte Brown, 11 So.3d 933 (Ala.2008), cert. denied, Brown v. Ala *349 bama, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009). ‘We have often stated that “ ‘[although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.’ ” Boyd v. State, 715 So.2d 825, 840 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Al.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ Hodges v. State, 856 So.2d 875, 932 (Ala.Crim.App.2001), affirmed, Ex parte Hodges, 856 So.2d 936 (Ala.2003), cert. denied, Hodges v. Alabama, 540 U.S. 986, 124 S.Ct. 465, 157 L.Ed.2d 379 (2003) (finding that ‘a trial court is not bound to find as a mitigating circumstance that a codefen-dant received a lesser sentence than death. See Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Al.2001)’).”
— So.3d at-.
Here, Morris made no argument at sentencing concerning the existence of any nonstatutory mitigating circumstances. In fact, the only witness the defense presented was Morris’s sister, who became emotional and was unable to testify. Morris did not argue the existence of any of the now cited nonstatutory mitigating circumstances at the sentencing hearing.
“ ‘The trial court did not have an obligation to instruct on a statutory mitigating circumstance that was not relied upon or argued during the penalty phase. As we stated in Johnson v. State, 820 So.2d 842, 875 (Ala.Crim.App.2000), [affd], 820 So.2d 883 (Ala.2001):
“ ‘ “Johnson did not present any evidence at the penalty phase concerning the statutory mitigating circumstances enumerated in § 13A-5-51....
[[Image here]]
“ ‘ “The trial court’s instructions were consistent with the evidence presented at the penalty phase; they did not constitute plain error. As we stated in Pressley v. State, 770 So.2d 115, 141-42 (Ala.Cr.App. 1999):
“ ‘ “ ‘The trial judge had no burden to recognize a statutory mitigating circumstance not presented by the defense, and proffer it to the jury.... There is no requirement that the trial court read the entire list of statutory mitigating circumstances to a jury where there was no evidence offered to support each circumstance. Holladay v. State, 629 So.2d 673, 687 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994). The trial court’s instructions were sufficient. The trial court did not commit plain error by not sua sponte instructing the jury on a statutory mitigating circumstance not offered by Pressley.”
“ ‘ “See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).” ’
“McGriff v. State, 908 So.2d 961 at 1020 (Ala.Crim.App.2000) (opinion on return to remand).”
Ziegler v. State, 886 So.2d 127, 148 (Ala.Crim.App.2003), cert. denied, 543 U.S. 863, 125 S.Ct. 194, 160 L.Ed.2d 106 (2004).
*350 The jury was charged as to every statutory mitigating circumstance and charged that it could consider any aspect of Morris’s character or record. See § 13A-5-51 and § 13A-5-52, Ala.Code 1975. The trial court is not required to recognize a non-statutory mitigating circumstance where no evidence was presented at sentencing as to its existence, nor was any such non-statutory mitigating circumstance argued by Morris as to any impact it may have in determining his sentence.
B.
Morris argues that the trial judge and the jury improperly counted the same aggravating circumstance twice. He refers to the aggravating circumstances that the murder was committed while Morris was engaged in the commission of a burglary, § 13A-5-49(4), Ala.Code 1975, and that the murder was committed when Morris was engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975. He argues that because the same conduct supported a finding of both aggravating circumstances, the trial court and jury should have considered and found only one.
Morris raises this claim for the first time on appeal; therefore, this claim must be evaluated pursuant to the plain-error rule. See Rule 45A, ala.R.App.P.
However, this Court has previously recognized that if two or more of the circumstances that make the offense a capital offense are also aggravating circumstances under § 13A-5-49(4), Ala.Code 1975, then the trial court may consider and find each of the underlying offenses as an aggravating circumstance and so charge the jury.
In Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002), cert. denied, 547 U.S. 1056, 126 S.Ct. 1653, 164 L.Ed.2d 399 (2006), Turner claimed that his constitutional rights had been violated by the consideration of both robbery and rape, the underlying offenses in his capital-murder charge, as two separate aggravating circumstances. This Court found:
“As we stated in Hodges v. State, 856 So.2d 875, 889 (Ala.Crim.App.2001), ‘If the actions committed during the course of the murder support the finding that more then one of the enumerated underlying felonies was committed, then a trial court may apply § 13A-5-49(4) more than once.’ Citing Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1997), aff'd, 730 So.2d 1246 (Ala.1999).”
924 So.2d at 790.
The circumstances of Rochester’s murder support a finding that the murder occurred during a burglary and robbery and that each aggravating circumstance should apply to Morris’s sentencing.
C.
Morris argues that the Eighth Amendment to the United States Constitution requires that he be sentenced to no more than life in prison without parole. Specifically, Morris contends that because the murder was “entirely unplanned and given the wealth of mitigating evidence in Mr. Morris’s background,” the aggravating circumstances were outweighed by the mitigating circumstances, and he should have been sentenced to life imprisonment without the possibility of parole.
Morris raises this issue for the first time on appeal; thus, the plain-error rule applies. See Rule 45A, Ala.R.App.P.
The process of weighing the aggravating circumstances and the mitigating circumstances is addressed in § 13A-5-48, Ala. Code 1975:
“The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to *351 determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.”
The weighing process is best undertaken by the sentencing authority, who has directly heard the evidence and seen the witnesses and therefore can better determine what evidence should have the greater impact in determining the proper punishment for the capital defendant. This process does not deal with numerical values or comparisons. The determination rests on the specific circumstances of each case.
“In keeping with the dictates of the United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Crim.App.1983), rev’d on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.”
Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984), cert. denied, Clisby v. Alabama, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985).
Moreover,
“ ‘ “ ‘[w]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.’
‘““[Ford v. Strickland,] 696 F.2d [804,] at 818 [ (11th Cir.1983) ]. Alabama courts have adopted the Eleventh Circuit’s rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (‘while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
“ ‘ “Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense.” ’ ”
*352 Harris v. State, 2 So.3d 880, 905 (Ala.Crim.App.2007).
Here, the trial court properly weighed the aggravating circumstances and the mitigating circumstances before determining Morris’s sentence. The judge did not err in determining that the three aggravating circumstances that the murder was committed during the course of a robbery and a burglary (§ 13A-5^19(4)) and that Morris had previously been convicted of a violent felony (§ 13A-5-49(2)) outweighed the mitigating circumstances surrounding his character and background.
III.
Morris alleges that the charges against him should be dismissed because, he says, he was denied his constitutional right to a speedy trial. Morris argues that the six-year gap between his arrest and his first trial was presumptively prejudicial and was caused by the State’s negligence. He further contends that he did not acquiesce to the delay and that he was prejudiced because the witnesses’ memories may have been affected; moreover, certain witnesses may have disappeared.
Morris first raised this argument in his brief in his first appeal; therefore, any error must rise to the level of plain error. See Rule 45A, Ala.R.App.P. See also Sharp v. State, [Ms. CR-05-2371, August 29, 2008] — So.3d -, - (Ala.Crim.App.2008).
The record indicates that Rochester’s murder occurred on February 25, 1997, and that Morris was arrested for public intoxication on that same date. The arrest warrant charging him with Rochester’s murder was issued on February 27, 1997. On March 31, 2003, jury selection began in Morris’s first trial.[6] Thus, the delay between Morris’s arrest and his trial was approximately 73 months.
“As the Alabama Supreme Court stated in Ex parte Walker, 928 So.2d 259, 263 (Ala.2005):
“‘An accused’s right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Art. I, § 6, of the Alabama Constitution, 1901. As noted, an evaluation of an accused’s speedy-trial claim requires us to balance the four factors the United States Supreme Court set forth in Barker [v. Wingo, 407 U.S. 514 (1972) ]: “[ljength of delay, the reason for the delay, the defendant’s assertion of [her] right, and prejudice to the defendant.” 407 U.S. at 530, 92 S.Ct. 2182 (footnote omitted). See also Ex parte Carrell, 565 So.2d [104] at 105 [ (Ala.1990) ]. “A single factor is not necessarily determinative, because this is a ‘balancing test, in which the conduct of both the prosecution and the defense are weighed.’ ” Ex parte Clopton, 656 So.2d [1243] at 1245 [ (Ala.1985) ] (quoting Barker, 407 U.S. at 530, 92 S.Ct. 2182). We examine each factor in turn.’
“(Footnotes omitted.)
“A. Length of delay. As the Ex parte Walker court stated concerning the length of the delay:
‘“In Doggett v. United States, the United States Supreme Court explained that the first factor — length of delay — “is actually a double enquiry.” 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry under this factor is whether the *353 length of the delay is “ ‘presumptively prejudicial.’ ” 505 U.S. at 652, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 530-31, 92 S.Ct. 2182). A finding that the length of delay is presumptively prejudicial “triggers” an examination of the remaining three Barker factors. 505 U.S. at 652 n. 1, 112 S.Ct. 2686 (“[A]s the term is used in this threshold context, ‘presumptive prejudice’ does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry.”). See also Roberson v. State, 864 So.2d 379, 394 (Ala.Crim.App.2002).
“ ‘In Alabama, “[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — to the date of the trial.” Roberson, 864 So.2d at 394. Cf § 15-3-7, Ala.Code 1975 (“A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.”); Rule 2.1, Ala. R.Crim.P. (“All criminal proceedings shall be commenced either by indictment or by complaint.”). The length of the delay in this case was approximately 50 months: Walker was indicted on January 14, 2000, and she pleaded guilty on March 25, 2004. See Carrell, 565 So.2d at 107 (calculating the length of delay from defendant’s indictment until his plea of guilty). The State concedes (and both the trial court and the Court of Criminal Appeals held) that the 50-month delay in Walker’s case was presumptively prejudicial.’
“928 So.2d at 263-64 (footnotes omitted).”
Belisle v. State, 11 So.3d 256, 271-72 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009).
Here, because the delay was 73 months, the delay was presumptively prejudicial. Accordingly, we examine the remaining factors set out in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).
As to the reasons for the delay, “ ‘[tjhe State has the burden of justifying the delay.’ ” Ex parte Anderson, 979 So.2d 777, 780 (Ala.2007). In the present case, the majority of the delays are attributable to Morris. Morris was arrested on February 25, 1997, and the case-action summary included in the record of Morris’s first trial indicates that the case was assigned to the original trial court in December 1997. Morris was arraigned in January 1998, and the case was set for trial in May 1998. A number of motions were filed, largely by defense counsel, and subpoenas were issued, and his case was reset for trial on February 22,1999. However, on February 10, 1999, Morris filed a motion for continuance until a psychiatric evaluation could be completed. The trial court ordered that Morris be evaluated for competency to stand trial and mental state at the time of the offense. Dr. Kimberly Ackerson was then appointed by the trial court, and she examined Morris in May 1999. He was again examined for the same reasons by Dr. Clyde Williams. Both experts found Morris incompetent to stand trial, but determined that his competency could be restored through competency training. Thereafter, on November 11, 1999,[7] the State filed a motion to deter *354 mine Morris’s competency because the trial had been set for December 6,'1999.
Morris was found incompetent to stand trial by order dated February 21, 2001, and required to undergo competency training by the Alabama Department of Mental Health and Mental Retardation at Taylor Hardin Secure Medical Facility. Morris attended outpatient competency training sessions from March 9, 2001, until March 31, 2001. Morris’s assessment. scores failed to improve, and on June 22, 2001, Wyatt Rhone filed a competency-evaluation report indicating that he believed that Morris was purposefully giving false, answers and malingering; therefore, on November 8, 2001, the State filed a motion requesting that Morris be placed into inpatient treatment, training, and evaluation. In that motion, the State argued that the case had been continued a number of times to determine Morris’s competency and that there was still no basis on which to determine whether Morris had benefited from the training or whether he was currently competent to stand trial. Thus, the trial court ordered Morris to be committed to Taylor Hardin Secure Medical Facility on December 4, 2001, and he was committed on December 18, 2001. On January 31, 2002, Morris was diagnosed as competent to stand trial by Dr. Nagi, who also determined that Morris had been malingering. On July 26, 2002, the State again requested a competency hearing, which was held on December 9, 2002. Morris was determined to be competent on January 15, 2003, and the striking of the jury began on March 31, 2003.
Thus, almost four years of the delay were attributable to determining Morris’s competency to stand trial. Moreover, it was concluded that for at least part of the treatment, he had been malingering. “ ‘ “ ‘Delays occasioned by the defendant or on his behalf are excluded from the length of the delay and are heavily ■ counted against the defendant in applying the balancing test of Barker.’ ” ’ Ex parte Walker, 928 So.2d at 265 (Ala.2005) (quoting Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993), quoting in turn McCollum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).” Ex parte Anderson, 979 So.2d at 781.
“ ‘Barker v. Wingo recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531, 92 S.Ct. 2182. Courts assign different weight to different reasons for delay. Deliberate delay is “weighted heavily” against the State. 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101. Deliberate delay includes an “attempt to delay the trial in order to hamper the defense” or “ ‘to gain some tactical advantage over (defendants) or to harass them.’ ” 407 U.S. at 531 & n. 32, 92 S.Ct. 2182 (quoting United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay. Barker, 407 U.S. at 531, 92 S.Ct. 2182; Ex parte Carrell, 565 So.2d [104,] 108 [ (Ala.1990) ]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531, 92 S.Ct. 2182; Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App. 1993) (“ ‘Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.’ ”) (quoting McCal- *355 lum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).’
“Contrary to the appellant’s allegations in his brief to this court, there is not any indication that the State deliberately or negligently delayed the trial in any way. In fact, during several pretrial hearings, the State expressed concern about not delaying the trial unnecessarily. Based on the record before us, it appears that very little of the delay was actually attributable to the State. Thus, ‘we see no deliberate delay by the State to enhance its own ease or to prejudice the defense.’ Irvin v. State, 940 So.2d 331, 343 (Ala.Crim.App.2005).
“Some of the delay in this case was caused by neutral reasons that are not attributable to either the State or the appellant. The investigation was completed, forensic analysis was performed, psychological testing was done, discovery was conducted, and numerous evi-dentiary matters were resolved. Neutral reasons for delay do not Ordinarily require a dismissal of the case based on a violation of the right to a speedy trial. See Pierson v. State, 677 So.2d 830, 831 (Ala.Crim.App.1996).
[[Image here]]
[[Image here]]
“... Thus, the majority of the delay was justified delay that was attributable to the appellant and/or to the trial court, and it weighs heavily against the appellant rather than against the State.”
Sharp v. State, [Ms. CR-05-2371, August 29, 2008] — So.3d -, - (Ala.Crim.App.2008).
Because the majority of the delays were the result of motions filed by Morris concerning his competency and there was no indication of unjustified delays or negligence on this ground by the State, this reason for the delay is not weighed against the State, but rather against Morris. See Belisle v. State, 11 So.3d at 272 (“It appears that the majority of the delays were due to motions filed by Belisle. ‘Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531, 92 S.Ct. 2182.’ Ex parte Walker, 928 So.2d 259 at 265 (Ala.2005).”) See also Blackmon v. State, 7 So.3d 397, 448 (2005), cert. denied, — U.S. -, 129 S.Ct. 2052, 173 L.Ed.2d 1136 (2009) (“It appears that a good portion of the delays were based on motions filed by Black-mon.”). See also Sharifi v. State, 993 So.2d 907, 924 (Ala.Crim.App.2008), cert. denied, — U.S. -, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008) (“The record shows that the circuit court took every precaution to ensure that Sharifi was granted a fair trial. It is clear that the majority of the delays were due to the court’s desire to make every resource available to Sharifi before he faced trial on the capital charge.”).
Morris did not assert his right to a speedy trial until the appeal from his first trial. In Belisle v. State, 11 So.3d at 272, where Belisle did not assert his right to a speedy trial until 10 months before he was tried, this Court stated:
“‘An accused does not waive the right to a speedy trial simply by failing to assert it. Barker, 407 U.S. at 528, 92 S.Ct. 2182. Even so, courts applying the Barker v. Wingo factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, and not every assertion of the right to a speedy trial is weighted equally. Compare Kelley v. State, 568 So.2d 405, 410 (Ala.Crim.App.1990) (“Repeated requests for a speedy trial *356 weigh heavily in favor of an accused.”), with Clancy v. State, 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighing third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: “ ‘The fact that the appellant did not assert his right to a speedy trial sooner “tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.” ’ ”) (quoting Benefield v. State, 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and Brown v. State, 392 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).’
“Ex parte Walker, 928 So.2d at 265-66.”
Moreover, in Sharp v. State, supra, Sharp failed to raise this issue in a pretrial motion for a speedy trial. Instead, he raised this contention in a posttrial motion for a judgment of acquittal. This Court quoted Irvin v. State, 940 So.2d 331, 343 (Ala.Crim.App.2005), stating:
“ ‘Irvin failed to assert his constitutional right to a speedy trial below. The record contains no motion for a speedy trial. In Barker v. Wingo, the Supreme Court recognized, “failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.” 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d 101. Likewise, this Court has held:
“ ‘ “ ‘Since there was no effort on the part of the appellant to secure his right to a speedy trial ... he may not complain of any delay on appeal.’ Tidmore [v. City of Birmingham], 356 So.2d [231,] 233 [ (Ala.Crim.App.1977) ]. While a defendant who fails to demand a speedy trial does not forever waive his right, this is one factor which must be considered.”
“ ‘Bailey v. State, 375 So.2d 519, 523 (Ala.Crim.App.1979). In Turner v. State, 924 So.2d 737, 748 (Ala.Crim.App.2002), this Court recognized that the failure of the defendant to assert his right to a speedy trial weighed against a finding of plain error regarding this claim.’ ”
— So.3d at-.
Because Morris did not assert this right until the appeal from his first trial, this factor must weigh against him.
Finally, Morris has failed to show any prejudice as a result of this delay. He alleges in his brief on appeal that he did not acquiesce to this delay and that the delay may have resulted in diminished memories of the witnesses. He, however, does not present any specific example of such a diminished memory. He alludes to the fact that the paramedic’s notes were destroyed, but there is no indication in the record that this in any way affected her testimony.
He also claims that certain witnesses may have disappeared and states that defense counsel attempted to subpoena three Huddle House restaurant employees before Morris’s first trial, who could have testified that he was present there on the night of the offense. However, even if Morris had been to the Huddle House restaurant, that does not negate his commission of the offense on the same night. He also speculates that the police officer who had guarded the door to Rochester’s house, who could not be identified at trial, may have confirmed that Rochester’s dog left the house on the morning following the offense. Thus, he speculates that the dog could then have transferred the blood to Morris’s shoe. This possible evidence, he claims, would have refuted the State’s evidence that the dog did not leave the house. *357 However, this claim is clearly conjecture based on more conjecture.
These cited instances by Morris are speculation and fail to show any resulting prejudice. Moreover, because the State acted with due diligence in attempting to timely bring Morris to trial, he has failed to meet his burden of proving prejudice. “ ‘[W]here the state pursues the accused “with reasonable diligence,” the delay — however long — generally is excused unless the accused demonstrates “specific prejudice to his defense.” Doggett[v. United States,] 505 U.S. [647,] at 656 112 S.Ct. 2686 [ (1992) ]. Thus, when the state acts with reasonable diligence in bringing the defendant to trial, the defendant has the burden of proving prejudice caused by the delay.’ ” Sharp v. State, — So.3d at-, quoting Ex parte Walker, 928 So.2d at 267. “Appellant must point to specific facts in evidence to support his claim. United States v. Radue, 707 F.2d 493, 495 (11th Cir.), cert. denied, 464 U.S. 916, 104 S.Ct. 281, 78 L.Ed.2d 259 (1983). ‘[S]peculative allegations, such as general allegations of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice.... ’ United States v. Butts, 524 F.2d 975, 977 (5th Cir.1975), citing United States v. McGough, 510 F.2d 598, 604 (5th Cir.1975).” Haywood v. State, 501 So.2d 515, 518 (Ala.Crim.App.1986). See also Lawson v. State, 954 So.2d 1127, 1134-35 (Ala.Crim.App.2006). Because Morris has failed to show any prejudice based on the delay, this factor must be weighed against him.
After reviewing Morris’s claim that his constitutional right to a speedy trial had been violated by the delay between his arrest and first trial, and evaluating and weighing the Barker factors, there was no plain error on this ground.
IV.
Morris argues that his conviction should be overturned because the State was allowed to introduce an unreliable witness identification of him based on an im-permissibly suggestive one-man showup. He alleges that the identification of him by the paramedic on the morning following the offense was unduly suggestive, was not independently reliable, and was not harmless error.
The record indicates that, when the paramedic responded to the call at Rochester’s home, the paramedic informed the police about the man she had seen earlier at that location who had attempted to gain entry into the house and to learn the details of the first emergency call involving Russell. She gave them a description of the man, and when Morris, who matched the description, was seen by an officer later that morning in the area of the offense, the paramedic was taken to view and possibly identify Morris as that man.
She testified that, at approximately 9:00 p.m. during the initial emergency call, after she first began speaking with the man, he approached her on the walkway to the house. As they spoke, he attempted to walk around her, but she blocked him. At that time, they were standing “literally toe to toe.” (R. 205.) She estimated that their faces were less than 24 inches apart. (R. 205.) After he had been instructed to leave and appeared to have done so, the paramedic again saw him when she had stepped down from the back of the ambulance. She testified that he was on the sidewalk within 10 feet of her when he was again instructed to leave. (R. 210-11.) As to her ability to clearly see the man, she stated that there was lighting from the house, a street light, and lights from the fire and rescue vehicles called “scene lights.” (R. 212.) She also testified that “I’m fairly certain that it was a pretty *358 good moon that night but it was very clear for me to be able to see him.” (R. 212.)
After giving the police a description of the man and the clothes he was wearing during her second dispatch, which occurred around midnight, she was taken to the location where Morris was arrested for public intoxication, between 4:00 and 5:00 a.m., by police car. She was asked to view the man, but she testified that the officers “never said that it was the person or anything like that.” (R. 222.) She stated that “I looked at him and realized who he was, I knew who he was.” (R. 222.) She stated that she recognized him as the man she had confronted earlier, but that, out of an abundance of caution, she planned on requesting that the officers order him to speak. He began talking and “fussing” before she could do so, and she testified that “I knew when I saw him that it was him, but that was just a confirmation to me that it was him.” (R. 223.) The paramedic stated that she identified the man to the officers and told them that laceration on the man’s forehead had not been there earlier. (R. 223.) She again identified Morris at trial as the man that she had seen on those two occasions “without a doubt.” (R. 225.)
In the present case, the one-man showup was conducted approximately four hours after the paramedics informed the police about the man who had earlier been present at the scene of the offense, and approximately seven hours after she had seen him. She was shown only Morris to identify.
“In Ex parte Appleton, 828 So.2d 894 (Ala.2001), this Court noted:
“1 “The danger inherent in a one-man showup, where a witness is shown a single suspect and asked, ‘Is that the man?’ is twofold. First, a one-man showup conveys a clear message that ‘the police suspect this man.’ Second, a one-man showup does not give the witness a choice of identifying another person as being the perpetrator of the crime charged. Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness’s identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.” ’
“828 So.2d at 899-900 (quoting Ex parte Frazier, 729 So.2d at 254-55 (citations omitted) (emphasis omitted)).”
Ex parte Wimes, 14 So.3d 131, 134 (Ala. 2009). However, despite the susceptibility to unreliability a one-man showup presents, “ ‘ “it is permitted where conducted promptly after the commission of a crime or demanded by necessity, emergency, or exigent circumstances.” ’ ” Gavin v. State, 891 So.2d 907, 959 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004), cert. denied, Gavin v. Alabama, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005), quoting Ex parte Appleton, 828 So.2d 894, 900 (Ala.2001), quoting in turn Brazell v. State, 369 So.2d at 29.
Moreover, the clear import of evaluating the procedures employed in pretrial identifications, as well as identification testimony, is to determine reliability. There are two prongs involved in this evaluation; the first addresses the suggestiveness of the initial identification.
“The second prong of the Brazell [v. State, 369 So.2d 25, 28-29 (Ala.Crim.App.1978) ] test requires us to address whether the ‘ “procedure found to have been ‘unnecessarily’ or ‘impermissibly’ suggestive was so ‘conducive to irreparable mistaken identification’ ... or had such a tendency ‘to give rise to a very substantial likelihood of irreparable mis- *359 identification’ ... that allowing the witness to make an in-court identification would be a denial of due process.” ’ Brazell, 369 So.2d at 28-29 (quoting United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-15 (2d Cir.1970)). We evaluate the likelihood of misidentification under the five factors set forth in Neil v. Biggers[, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ]:
“ ‘[1] [T]he opportunity of the witness to view the criminal at the time of the crime, [2] the witness’ degree of attention, [3] the accuracy of the witness’ prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.’
“409 U.S. at 199-200, 93 S.Ct. 375 (emphasis omitted).”
Ex parte Wimes, 14 So.3d at 134-35.
Here, even if the initial showup was unduly suggestive, the paramedic’s testimony reveals that the circumstances surrounding her observing and hearing Morris support the reliability of her identification. She testified to the duration of the confrontation, her proximity to Morris during the confrontation, and the good lighting conditions. Her testimony clearly indicated a high degree of attention to him due to her role as a caregiver whose responsibilities, she testified, included protecting the equipment, especially in light of his aggressive and unruly behavior. She described Morris as approximately five feet and eight inches tall, medium build, dark complexion, and “not real clean shaven.” (R. 217-18.) She stated that he was wearing a baseball cap, a sateen jacket, and possibly a sweatshirt. She also described “what we would now call desert camo sand, the brown tones of the camouflage pants and tennis shoes.” (R. 217-18.) Further, her testimony confirms the certainty of this identification. Finally, all of these bases of her identification happened within approximately seven hours and were part of her single shift.
“As this Court noted in O’Dell v. State, 482 So.2d 1341 (Ala.Crim.App. 1985):
“ ‘ “[I]t is settled law that prompt, on-the-scene confrontations are not constitutionally impermissible, but are consistent with good police work.” (Citations omitted.) Hobbs v. State, 401 So.2d 276, 279 (Ala.Cr.App.1981). A prompt on-the-scene identification of a suspect increases the reliability of the identification under the following rationale:
“ ‘ “[T]he police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.” Id. at 280, quoting Bates v. United States, 405 F.2d 1104 (D.C.Cir.1968).’
“482 So.2d at 1346.” *360 v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978).
*359 Gavin v. State, 891 So.2d at 960.
Here, the factors enumerated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), all support the reliability of the paramedic’s identification of Morris as the man she had confronted at the scene of the offense only hours before the murder. Thus, even if the one-man showup had been unduly suggestive, it did not taint her identification as it did not invite an irreparable misidentification. Ex parte Appleton, 828 So.2d at 900; Brazell
*360 V.
Morris argues that the trial court repeatedly and improperly admonished him in front of the jury. He refers to instances during his testimony of conversations he had had with police officers when the trial court admonished him to testify only as to what he and the officer did rather than what was said. Morris contends that this testimony was not hearsay because it was not being offered to prove the truth of the matters asserted. Further, he contends that the trial court’s actions diminished his credibility with the jury and left him unable to fully present his testimony to the jury.
Morris failed to object to any of these instances at trial; in fact, defense counsel indicated that he agreed that Morris was attempting to give hearsay testimony and instructed him accordingly. Therefore, this issue is to be analyzed under the plain-error rule. Rule 45A, Ala.R.App.P.
This testimony by Morris was restricted as to what he was told by a police officer as he was recounting his arrest and identification by the paramedic. All the statements from the officer were instructions or informational to Morris to facilitate Morris’s arrest.
“Rule 801(c), Ala. R. Evid., reads:
“ ‘ “Hearsay” is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.’
“Rule 802, Ala. R. Evid., provides that
“ ‘[hjearsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.’ ”
Ex parte Baker, 906 So.2d 277, 283 (Ala.2004), on remand, 906 So.2d 292 (Ala.Crim.App.2005).
The trial court’s restrictions on Morris’s testimony concerned out-of-court statements made by a police officer.[8] See generally Vaughn v. State, 37 So.3d 183, 186 (Ala.Crim.App.2009) (“Testimony from Officer Shultz regarding what the victim told him constituted hearsay; the nonhearsay portion of his testimony — what he observed when he arrived at the scene — did not constitute substantive evidence necessary to support a revocation of probation.”). Cf. White v. State, 900 So.2d 1249, 1261 (Ala.Crim.App.2004) (“His only objection seems to be that Slaton was permitted to testify about hearsay, but Slaton did not testify about what Thompson told him, only that he met Thompson at the location where Newton had testified she met Thompson.... Slaton’s testimony about what he did was not hearsay.”).
Even if this testimony might have been admissible because it was being offered not “to prove the truth of whatever facts might be stated, ‘but rather to establish the reason for action or conduct by the witness,’ ” Grayson v. State, 824 So.2d 804, *361 813 (Ala.Crim.App.1999), quoting Edwards v. State, 502 So.2d 846, 849 (Ala.Crim.App.1986), quoting in turn Tucker v. State, 474 So.2d 131, 132 (Ala.Crim.App.1984), rev’d on other grounds, 474 So.2d 134 (Ala.1985), its omission was harmless. Morris was not prevented from or restricted in testifying as to his account of the events. For example, although, as a result of the objections he changed his testimony to state that he got out of the police car for the paramedic to look at him, rather than testifying that the officer told him to do so, the subject matter of the testimony remained the same.
There is no indication in the record that these instructions in any way limited Morris’s testimony. Any error on this basis was harmless, and Morris’s substantial rights were not probably affected by these restrictions. “No judgment may be reversed or set aside, nor new trial granted ... on the ground of misdirection of the jury ... or the improper ... rejection of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.” Rule 45, Ala.R.App.P. See also O.A.C. v. State, 851 So.2d 146, 152 (Ala.Crim.App.2002) (trial court did not erroneously prevent appellant from testifying as he “failed to make the necessary threshold showing that the evidence he sought to introduce was sufficiently probative with respect to his claimed defense, so as to tip the balance in favor of admitting the evidence on the basis of his constitutional right to present a defense.”); Williams v. State, 531 So.2d 49 (Ala.Crim.App.1988) (any error in the trial court’s limitation of examination of defense witness concerning victim’s intoxication was harmless); King v. State, 929 So.2d 1032, 1039-40 (Ala.Crim.App.2005) (trial court’s limitation of King’s cross-examination of his wife, if error at all, was harmless).
We find no plain error as to this claim.
VI.
Morris argues that the Eighth Amendment to the United States Constitution prohibits his execution because his previous trial resulted in a hung jury. Morris raises this issue for the first time on appeal; therefore, it is due to be analyzed under the plain-error rule. Rule 45A, Ala.R.App.P.
Morris’s second trial ended when the trial court declared a mistrial because the jury was unable to reach a verdict. Although Morris contends that this fact should disallow any future sentence of death as to the same offense, there is no legal support for Morris’s argument.
In State v. Woods, 382 S.C. 153, 676 S.E.2d 128 (2009), Woods’s first trial ended in a hung jury and mistrial, and he was retried and sentenced to death. In addressing whether a change of venue was appropriate for the second trial based on the trial court’s holding in the first trial, the court stated:
“A mistrial is the equivalent of no trial and leaves the cause pending in the circuit court. State v. Smith, 336 S.C. 39, 518 S.E.2d 294 (Ct.App.1999). It leaves the parties ‘as though no trial had taken place.’ Grooms v. Zander, 246 S.C. 512, 514, 144 S.E.2d 909, 910 (1965) (rulings of trial judge in proceeding ending in mistrial represent no binding adjudication upon the parties as the mistrial leaves the parties in status quo ante). A court ruling as to admissibility and competency of testimony during a trial which is later declared a mistrial results ‘in no binding adjudication of the rights of the parties.’ Keels v. Powell, 213 S.C. 570, 572, 50 S.E.2d 704, 705 (1948).
*362 [[Image here]]
“Here, the ease having resulted in a mistrial, it was a nullity and therefore began anew when called again for trial. State v. Mills, 281 S.C. 60, 814 S.E.2d 324, cert. denied 469 U.S. 930, 105 S.Ct. 324, 83 L.Ed.2d 261 (1984) (when mistrial occurs because of inability of jury to agree on verdict, it is the same as if no trial took place).”
382 S.C. at 157-58, 676 S.E.2d at 131. See e.g. State v. Manning, 329 S.C. 1, 495 S.E.2d 191 (1997) (wherein Manning was sentenced to death for murdering a state trooper and his conviction was reversed on appeal, leading to a second trial, which resulted in a mistrial because the jury could not reach a decision); People v. Hovarter, 44 Cal.4th 983, 81 Cal.Rptr.3d 299, 189 P.3d 300 (Cal.2008) (wherein jury was unable to reach a verdict as to penalty in Hovarter’s first trial for capital murder committed during a rape and kidnapping, resulting in a mistrial and he was retried and convicted and sentenced to death); Hogan v. State, 139 P.3d 907, 948-49 (Okla.Crim.App.2006) (“Where a capital-stage jury becomes ‘deadlocked’ during its deliberations, this is not an ‘acquittal’ on the death penalty. Hence the State can re-pursue the death penalty in a re-sentencing or retrial in the same case. Thus Sattazahn [v. Pennsylvania, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003)] applies the same rule to capital-stage ‘hung juries’ that the Court has consistently applied to hung juries in the guilt stage.” (footnotes omitted)).
The rationale in Hammond v. State, 776 So.2d 884 (Ala.Crim.App.1998), in which this Court found plain error in the prosecutor’s comment referencing Hammond’s previous trial, is applicable to this issue:
“We hold that at the sentencing phase of a second or subsequent capital murder trial, it is reversible error for the prosecution to comment on the result of a defendant’s previous trial for the same offense. Frazier v. State, 632 So.2d 1002, 1007 (Ala.Cr.App.1993). It does not matter that trial counsel did not preserve this error for review; we find the error to be plain error. Rule 45A, Ala.R.App.P; Tomlin v. State, 591 So.2d 550 (Ala.Cr.App.1991); Frazier v. State, supra. This is especially so when the prosecution informs the jury that a previous jury recommended, and a previous judge imposed, the death penalty. In determining whether Hammond should receive the death penalty or life imprisonment without parole, this jury was aware of how another jury had resolved this very issue — adversely to the defendant. If a juror was uncertain as to whether aggravating circumstances existed, or, if found to exist, whether they outweighed the mitigating circumstances, the knowledge that 12 other people had determined that it did could have swayed the juror’s verdict in favor of death. Further, the jury’s awareness of Hammond’s previous death sentence would diminish its sense of responsibility and mitigate the serious consequences of its decision. People v. Hope, 116 Ill.2d 265, 274, 508 N.E.2d 202, 205, 108 Ill. Dec. 41, 45 (Ill.1986).”
776 So.2d at 892.
There is no prohibition against a death sentence in a second trial where a capital defendant’s first trial resulted in a mistrial attributable to a hung jury. In such a situation, a capital defendant is tried anew with a new jury. The previous jury’s determinations are neither attributable to nor to be considered by the later jury. Thus, there was no plain error on this ground.
*363 VII.
Morris argues that his sentence contravened Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because the jury did not determine whether he is mentally retarded; the jury did not unanimously find that the aggravating circumstances existed; and the jurors were instructed that their verdict was only a recommendation.
Morris failed to raise these issues at the trial court level; therefore, this issue is due to be evaluated under the plain-error rule. Rule 45A, Ala.R.App.P.
Initially, we note that the jury’s finding of guilt of the capital offenses containing, by definition, two aggravating circumstances indicates that the jury unanimously found the existence of these two aggravating circumstances. Specifically, in this case, the jury unanimously found the existence of the aggravating circumstances that the murder was committed while Morris was engaged in the commission of the burglary and of the robbery of Rochester by finding him guilty of the capital offenses of murder during a burglary and murder during a robbery. § 13A-5-49(4), Ala. Code 1975; § 13A-5-40(a)(2) and (4), Ala.Code 1975. Furthermore, the trial court instructed the jury that it could not vote on the death penalty unless it found the existence of at least one aggravating circumstance. (R. 592.)
“ ‘The Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial, indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed. Because the jury recommended by a vote of 10-2 that Lewis be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance.’ ”
Sharifi v. State, 993 So.2d 907, 940-41 (Ala.Crim.App.2008), cert. denied, — U.S. -, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008), quoting Lewis v. State, 24 So.3d 480, 535-36 (Ala.Crim.App.2006). See Newton v. State, [Ms. CR-05-1517, October 2, 2009] — So.3d -, - (Ala.Crim.App.2009) (“ ‘ “We note that Ring requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible.” ’ ’”).
Thus, it is clear that the jury unanimously found the existence of two aggravating circumstances. Therefore, there was no violation of Ring v. Arizona, supra.
*364 Moreover, as Morris concedes, Alabama does not require that a jury in a capital case make a determination of whether the defendant was mentally retarded. “[N]othing in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or in Ex parte Perkins, 851 So.2d 453 (Ala.2002), requires a jury determination of mental retardation.” Beclc-worth v. State, 946 So.2d 490, 510 (Ala.Crim.App.2005).
As to Morris’s claim that the trial court violated Ring v. Arizona, supra, by improperly instructing the jury that its sentencing decision was only a recommendation, this issue has previously been decided adversely to Morris. In Smith v. State, [Ms. CR-97-1258, January 16, 2009] — So.3d - (Ala.Crim.App.2007) (opinion on return to forth remand), this Court stated:
“We addressed this same issue in Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002), vacated on other grounds, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005), and stated:
“‘Duke also argues that Ring [v. Arizona, 536 U.S. 584 (2002),] requires penalty-phase relief when the jury is told that its verdict is “advisory” or merely a “recommendation.” Contrary to Duke’s contention, Ring does not address the advisory nature of a jury’s sentencing recommendation. Duke’s jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).’
“See also Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005).”
— So.3d at-(footnote omitted).
Therefore, Morris’s sentencing did not violate Ring v. Arizona, supra.
VIII.
Morris argues that the trial court improperly instructed the jury concerning its consideration of the aggravating and mitigating circumstances. Specifically, Morris contends that the trial court erred by failing to instruct the jury that it was required to unanimously find the existence of at least one particular aggravating circumstance and that it did not have to be unanimous in its decision as to the mitigating circumstances. Moreover, Morris alleges that the trial court failed to instruct the jury that it must recommend a sentence of life imprisonment without parole if it found that the aggravating circumstances and the mitigating circumstances were of equal weight.
These issues are being raised for the first time on appeal; and therefore, they must be evaluated under the plain-error rule. Rule 45A, Ala.R.App.P.
However, because the jury unanimously found beyond a reasonable doubt during the guilt stage that Morris committed a murder during the course of a burglary and during the course of a robbery, the jury unanimously found during the penalty phase the aggravating circumstances contained in these offenses. As this Court stated in Newton v. State, supra, when Newton argued that the trial court had violated his Eighth and Fourteenth Amendment rights by failing to instruct the jury that it had to be unanimous as to its findings concerning aggravating circumstances:
“We addressed and rejected a similar argument in Blackmon v. State, 7 So.3d *365 397, 432-33 (Ala.Crim.App.2005), as follows:
“ ‘Blackmon also argues that her death sentence violates Ring because the jury was not instructed that it had to unanimously determine the existence of the aggravating circumstance and the weight that should be assigned to that aggravating circumstance. Again, in Duke we stated:
“ ‘ “We note that Ring requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible. Alabama law does not require that the jury’s advisory verdict be unanimous before it can recommend death. See § 13A-5-46(f), Ala. Code 1975. Nothing in Ring supports Duke’s claim the jury’s advisory verdict be unanimous.” Duke, 889 So.2d at 43 n. 4.’
“During the guilt phase of the trial, the jury unanimously found beyond a reasonable doubt that Newton committed a murder during the course of committing a robbery. ‘The jury’s unanimous finding of one aggravating circumstance is sufficient to satisfy Ring.’ Ex parte McNabb, 887 So.2d 998, 1006 (Ala.2004). Therefore, Newton’s argument is without merit.”
— So.3d at-.
This Court also addressed Newton’s claim that his constitutional rights had been violated by the trial court’s failure to instruct the jury that it did not have to be unanimous in its decision as to the mitigating circumstances. In finding no plain error on this ground, the Court stated:
“We addressed a similar argument in Smith v. State, 795 So.2d 788, 835-36 (Ala.Crim.App.2000), as follows:
“‘Smith also argues that the trial court’s failure to instruct the jury that its finding as to mitigating circumstances did not have to be unanimous, implied that the mitigating circumstances had to be unanimous. There was no objection raised at trial concerning the court’s failure to instruct that the jury’s finding did not have to be unanimous. We review this issue for plain error. Rule 45A, Ala. R.App. P.
“ ‘A review of the jury’s instruction on mitigating circumstances does not reflect that the trial court instructed the jury that its decision that evidence was mitigating had to be unanimous. The trial court instructed that jury in accordance with the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178.
“ ‘As we recently stated in Hall v. State, 820 So.2d 113 (Ala.Cr.App.1999):
“ ‘ “This Court addressed a similar issue in Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999):
“ ‘ “ ‘Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence of a mitigating circumstance. Freeman did not object at trial to the trial court’s instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule [45A,] Ala. R.App. P.’
“ ‘ “We have reviewed the trial court’s instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, *366 or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1998), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).” ’ ”
— So.3d at-.
In the present case, a review of the trial court’s instructions to the jury concerning its duty in finding mitigating circumstances reveals that there is no “reasonable likelihood or probability” that the jurors might have believed that they were required to unanimously find the existence of any particular mitigating circumstance. Thus, there was no error.
Morris also claims that the trial court’s instruction failed to charge the jury that if it found that the weight of the aggravating circumstances and the mitigating circumstances was equal, it must recommend a sentence of life imprisonment without the possibility of parole. However, the instructions given by the trial court in the present case were essentially identical to those given in Ex parte McNabb, 887 So.2d 998, 1001 (Ala.2004), in which they were found to be harmless. In discussing McNabb decision, this court has written:
“The Alabama Supreme Court addressed this issue in Ex parte McNabb, 887 So.2d 998 (Ala.2004). In that case, the trial court instructed the jury as follows during the sentencing phase of the trial:
“ ‘[I]f, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: “We, the jury, recommend that the defendant be punished by death, and the vote is as follows .... ” However, if after a full and fair consideration of all of the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole.... ’
“McNabb, 887 So.2d at 1001. Thus, just as in this case, the language used in instructing the jury in McNabb did not specifically instruct the jury on what to do if the aggravating circumstances and mitigating circumstances were in balance.
“The Alabama Supreme Court held that although the trial court did not instruct the jury as to what to do when the mitigating circumstances and the aggravating circumstances were in balance, ‘the jury [in McNabb] was not invited to recommend a sentence of death without finding any aggravating circumstance.’ Id. at 1004. The Supreme Court then held that, in considering the jury charge in its entirety, it could not conclude that ‘the error “seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,” Ex parte Davis, 718 So.2d at 1173-74, so as to require a reversal of the sentence.’ McNabb, 887 So.2d at 1004.”
*367 Sale v. State, 8 So.3d 330, 349 (Ala.Crim.App.2008), cert. denied, 8 So.3d 352 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2062, 173 L.Ed.2d 1141 (2009).
Here, a review of the complete instructions given by the trial court reveals that there is no indication that the fairness of the sentencing proceedings was in any way affected. The jury was informed as to its role in weighing its findings as to the aggravating circumstances and the mitigating circumstances. Thus, there was no plain error as to this issue.
IX.
Morris argues that the prosecutor made improper statements in his opening and closing arguments, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Morris failed to object to any of these alleged improper remarks at trial; therefore, any error must rise to the level of plain error. Rule 45A, Ala.RApp.P.
A.
Morris contends that the prosecutor improperly prejudiced him in front of the jury by making the following argument concerning conflicting evidence between certain State’s witnesses and the evidence offered by the defense:
“If you believe the defense and you believe Alfonzo Morris you must also believe two additional things. You must believe that Officer Smith and Officer Shirley Jackson conspired to swap those cigarettes somehow and that they lied to you, both of them, on the stand.”
(R. 516.)
This comment by the prosecutor was merely referring to certain conflicts in the evidence offered by the State and the evidence offered by the defense. The officers referred to testified that a cigarette found at the scene of the offense contained Morris’s DNA. Morris testified that at the time of his arrest the arresting officer took a cigarette from him that Morris had had in his mouth. Morris testified that “the only cigarette that had my DNA on it is the cigarette he took out of my mouth—I mean, out of my pocket what I had in my mouth at the time of the arrest.” (R. 446.)
“The prosecutor properly argued to the jury evidence that contradicted that defense. The prosecutor has a right to present his impressions from the evidence. See Taylor v. State, 666 So.2d 36, 64 (Ala.Cr.App.), remanded on other grounds, opinion extended and affd on return to remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928,133 L.Ed.2d 856 (1996). The prosecutor may comment on proper inferences to be drawn from the evidence and may draw conclusions based on his or her own reasoning. Id.”
Gamble v. State, 791 So.2d 409, 431 (Ala.Crim.App.2000). See Ferguson v. State, 814 So.2d 925, 946-47 (Ala.Crim.App.2000), affirmed, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002) (holding that prosecutor can draw inferences and deductions from the evidence although Ferguson argued that prosecutor improperly “ ‘offered advice on how to evaluate Ferguson’s statements to police, which contradicted the testimony of his codefendant on the question of [Ferguson’s] role in the shootings’ ”).
The prosecutor properly argued his case to the jury, including referencing the evidence presented that contradicted that of the defense.
B.
Morris alleges that the prosecutor improperly told the jury that defense *368 counsel’s argument showed that Morris was lying. Specifically, Morris contends that, after defense counsel had argued that whoever committed the murder did not intend to do so, the prosecutor improperly commented that the defense was alleging contradictory theories: that Morris did not commit the offense and that he committed the offense but did not mean to commit it. Morris argues that this comment suggests that defense counsel’s remarks were substantive evidence and was an attempt by the State to lessen its burden of proof.
This argument by the prosecutor, however, was a legitimate comment on Morris’s theories of defense. “ ‘ “Argument by the prosecution concerning omissions and inconsistencies in the defendant’s version of the case is not improper.” ’ ” Whitt v. State, 733 So.2d 463, 482 (Ala.Crim.App.1998), quoting Mosely v. State, 628 So.2d 1041, 1042 (Ala.Crim.App.1993), quoting in turn Salter v. State, 578 So.2d 1092, 1096 (Ala.Crim.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991). “The prosecutor’s argument regarding the defense’s theory was a fair and legitimate comment on the evidence and a fair response to the argument of the defense.” Whitt v. State, 733 So.2d at 483. See Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004) (prosecutor’s comments during rebuttal closing argument of guilt phase of capital trial did not impermissibly shift the burden of proof but was a legitimate comment on the lack of evidence to support Minor’s theory of defense); Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000) (prosecutor’s comment during rebuttal closing argument at guilt phase did not spotlight defense’s strategy and argue that the evidence did not support defense’s theory that the robbery was a “ ‘mere afterthought’ ”). Here, the comment by the prosecutor was an appropriate response to Morris’s arguments. Butler v. State, 781 So.2d 994, 1004 (Ala.Crim.App.2000).
C.
Morris argues that the prosecutor improperly told the jury that it was its “oath” to convict Morris. Morris refers to an exhortation made by one of the prosecutors at the close of his guilt-phase argument, arguing to the jury that it was its oath to hold Morris responsible for this brutal murder.
“ ‘Generally, the prosecutor is in error by exhorting the jury to “do what’s right,” or to “do its job,” if that exhortation “implies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court’s instructions on the law.” ’ McNair v. State, 653 So.2d 320, 339-40 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Crim.App.1990). However, it is not improper for a prosecutor to argue to the jury that a defendant is guilty or to urge the jury to find the defendant guilty of the crime charged so long as that argument is based on the evidence; in fact, that is exactly what a prosecutor is supposed to do during closing argument. See Galloway v. State, 484 So.2d 1199 (Ala.Crim.App.1986), and the authorities cited therein. See also Broadnax v. State, 825 So.2d 134, 183 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), and Melson v. State, 775 So.2d 857, 889-90 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). Moreover, ‘ “the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.” ’ Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988), remanded on other grounds, 584 So.2d 862 (Ala.1991), on remand to, 587 So.2d 1071 *369 (Ala.Crim.App.1991), remanded on other grounds, 616 So.2d 348 (Ala.1992), on return to remand, 616 So.2d 352 (Ala.Crim.App.1993), quoting Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988). See also Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, ‘ “She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide” — did not transcend the bounds of legitimate argument’); Maples v. State, 758 So.2d 1, 58 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999) (prosecutor’s comment that the defendant ‘ “is a murderer; a capital murderer” ’ was not improper); Melson, 775 So.2d at 889 (prosecutor’s reference to the defendant as a ‘ “cold-blooded murderer” ’ with ‘ “no remorse” ’ was not improper); Thomas v. State, 766 So.2d 860, 933-34 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000) (prosecutor’s references to defendant as a ‘ “street punk,” ’ ‘ “criminal,” ’ ‘ “thug,” ’ ‘ “murderer,” ’ and ‘ “manipulator” ’ were not improper); and Kinard v. State, 495 So.2d 705, 711 (Ala.Crim. App.1986) (prosecutor’s reference to defendant as ‘ “an unmitigated liar and murderer” ’ was not improper). The prosecutor’s comments were supported by the evidence in this case and were not improper.”
Minor v. State, 914 So.2d 372, 420 (Ala.Crim.App.2004), (finding no plain error in prosecutor’s comment asking the jury “ ‘to find that man guilty of the murder of his son’ ”).
There was no plain error in this comment by the prosecutor.
D.
Morris argues that the prosecutor repeatedly made improper references to him as “ ‘the one liar in this case’ ” (Morris’s brief, at 101), based on his omission of details in his statements to the police. He further argues that in doing so, the prosecutor vouched for the credibility of State’s witnesses. Morris.fails to cite to the record in support of this argument.
A review of the closing arguments by both of the prosecutors, taking into account their total argument to the jury, reveals that the comments referring to Morris as lying or being a liar or implying deceit on Morris’s part, were based on the contradictions in the statements Morris gave to the police, Morris’s answers during his testimony suggesting that he did not remember or did not know, and his use of a false identification when he was arrested, as well as.the conflicts between his testimony and that of State’s witnesses.
This Court addressed this same issue recently in Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d - (Ala.Crim.App.2009), and stated:
“... [A]ny characterization of Johnson as a liar by the prosecutor would have been supported by the evidence in the present case because of the varying statements given by her to the police. She initially stated that she was in Tuscaloosa, Alabama, at the time of the murder, but eventually admitted that the-first statement was untrue and cast the blame on Richards; she eventually admitted having been involved in the . murder. Similarly, in Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000), Smith argued that the prosecutor improperly referred to him as a liar. This Court stated:
“‘Clearly, this characterization of the appellant is supported by the record. Smith, in his first statement, totally denied any involvement in the robbery-murder. In the second statement he admitted his participation in *370 the robber-murder. “[T]he prosecutor, in the appropriate case, may use opprobrious terms to characterize the accused or his conduct, provided that the remarks are in accord with the evidence.” Bankhead [v. State, 585 So.2d 97, 105 (Ala.Crim.App.1989)].’
“795 So.2d at 826.
“Further, there is no indication in the record that the prosecutor improperly vouched for the credibility of the State’s witnesses.
“ ‘ “A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[Prosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.’ Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
“““ “Attempts to bolster a witness by vouching for his credibility are normally improper and error.” ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness’ credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness’ veracity .... Secondly, a prosecutor may implicitly vouch for the witness’ veracity by indicating that information not presented to the jury supports the testimony.’
“ ‘ “United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).”
“ ‘DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).’
“Brown v. State, 11 So.3d 866, 910-11 (Ala.Crim.App.2007), affirmed, Ex parte Brown, 11 So.3d 933 (Ala.2008), cert. denied, Brown v. Alabama, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009).
“Here, there is no indication in the record that the prosecutor impermissi-bly vouched for any witness’s credibility as he never suggested that there was evidence undisclosed to the jury that would support a witness’s testimony nor did he ever make personal assurances of a witness’s veracity. Thus, there is no error on this ground.”
— So.3d at-.
The prosecutors’ references to Morris as being a liar were based on the evidence and were thus a proper argument to the jury. Moreover, the prosecutors did not vouch for the credibility of any witnesses in doing so.
X.
 Morris argues that his conviction is due to be overturned because, he says, the State failed to establish the reliability of the methodology for its DNA testing. Morris also argues that the State improperly failed to retain samples of DNA for testing by the defense. Morris failed to object at trial as to the methodology of the State’s DNA testing. Moreover, although the defense implied error in the State’s failure to retain a sample of the cigarette butt when cross-examining the State’s expert, Morris never objected on this ground.
*371 Morris contends that the trial court erred by failing to conduct an evidentiary hearing outside the jury’s presence as to the reliability of the State’s DNA testing. However, Morris never requested such a hearing or objected to its omission.
“In the present case, because the admission of the DNA evidence was not contested or challenged before or during trial, the trial court did not hold a hearing outside the presence of the jury. In Payne v. State, 683 So.2d 440, 455 (Ala.Cr.App.1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997), we held that a trial court did not commit reversible error by not holding a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. In Payne, we concluded that if a defendant wanted to allege that the trial court erred in not conducting a hearing outside the jury’s presence to determine the admissibility of the DNA evidence, it was incumbent upon the defendant to have first requested that such a hearing be conducted. Accordingly, because Simmons did not request a hearing, no reversible error occurred in this regard in the trial court’s admission of the DNA evidence.”
Simmons v. State, 797 So.2d 1134, 1145 (Ala.Crim.App.1999).
Moreover, in arguing that the State erred by failing to identify the method used to test the DNA and thereby to verify its reliability, Morris acknowledged that this Court has held counter to his argument in Broadnax v. State, 825 So.2d 134, 174 (Ala.Crim.App.2000), by finding that the State’s failure to name the particular method of DNA analysis did not result in unreliable evidence. Rather, this Court held that “[t]he failure of testimony to name the DNA method used goes to the weight of the evidence, not its admissibility.” Id.
“ ‘ “Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.” ’ ”
Broadnax v. State, 825 So.2d at 173-74, quoting Simmons v. State, 797 So.2d at 1144-15, quoting in turn, Turner v. State, 746 So.2d 355, 360-61 (Ala.1998).
Here, the methodology of the DNA testing was a matter concerning the weight to be accorded that evidence and there is no indication in the record or showing made by Morris that the testing was unreliable. Thus, to so conclude would be to yield to speculation.
As to Morris’s argument that the State’s failure to demonstrate the reliability of the DNA testing was compounded by the destruction of the cigarette butt during the pretrial testing, the record shows otherwise. On cross-examination, the State’s expert was asked about the destruction of the cigarette butt and the resulting inability of an independent test by a secondary expert. The expert testified that “[t]here’s DNA extract remaining, the liquid that— after the liquid dissolves the filter and sponge material, what’s left is called the DNA extract. And there’s a portion of that that we always retain for future testing if that’s required, so that is left, yes.” (R. 420.)
Thus, Morris suffered no prejudice — he could have tested the DNA using his own expert. See Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir.1994), cert. denied, 513 U.S. *372 831, 115 S.Ct. 106, 130 L.Ed.2d 53 (1994) (any failure by treating physician to collect samples from rape victim for subsequent testing went to the weight of the evidence rather than its admissibility). Cf. Ex parte Gingo, 605 So.2d 1237 (Ala.1992) (destruction of samples allowed evidence of test results only against Gingo and he was denied access to any potentially exculpatory material).
XI.
Morris argues that the trial court improperly restricted defense counsel from questioning police officers about the failure to investigate evidence suggesting that someone else had committed the murder. Specifically, Morris alleges that he was not allowed to question a State’s witness about whether his investigation revealed that a suspicious blue van with several black males was seen in the vicinity of Rochester’s house around the time of Rochester’s death.
The record contains the State’s renewal of its motion in limine and a second motion in limine, requesting the trial court to bar Morris from referring to a “ ‘blue car with several black males in it located in the alley.’ ” These motions, however, are dated as filed on March 19, 2007, and July 17, 2007, respectively, indicating that they were filed before Morris’s second trial, which ended in a mistrial. In the second motion in limine, the State argues that during the first trial, defense counsel questioned the State’s witness about his investigation of the alleged vehicle. The court held that the questioning called for inadmissible hearsay; therefore before the second trial the State requested that Morris be barred from a similar line of questioning.
In the third trial, just prior to voir dire, the following transpired:
“[Prosecutor]: Well, Judge, you know, I forget what all we did the last time but we just want to renew our motions in limine that no questions involving hearsay of — well, canvassing the neighborhood. I think they tried to ask the detective that. If the witnesses are available, that’s fine but we don’t — we would object to hearsay questions so we have a motion in limine about that. I believe you granted that last time.
“[Defense counsel]: That was about the blue car deal.
“[Prosecutor]: Right, that’s right.
“THE COURT: About the what?
“[Prosecutor]: There was a suspicious blue car in the alley or neighborhood or something. Who knows who said that.
“THE COURT: Well, to the extent it involves hearsay, I grant the motion in limine. You know, I kind of have to wait and see what happens, you know, as we progress and see how the question is asked because it’s difficult to do till I hear the questions.”
(R. 9-10.)
No further discussion was had on this subject, and Morris did not attempt to question the State’s witness as to any investigation concerning this alleged vehicle. Morris may not assert as error a bar to questioning a witness when he never sought to question the witness as to the information he now claims was relevant. The trial court stated that it could not rule on the questions until they were posed and only held that it would not allow inadmissible hearsay into evidence. It appears from the record that Morris was satisfied with, or acquiesced to, the trial court’s ruling. J.E. v. State, 997 So.2d 335, 340-41 (Ala.Crim.App.2007) (“J.E. cannot predicate error on the violation in the present case because he acquiesced in the determi *373 nation that the error was cured and that further correction was not required.”).
There is no error on this ground.
XII.
Morris argues that the trial court failed to properly instruct the jury on the reasonable-doubt standard. He raises this challenge for the first time on appeal; therefore, this instruction is due to be evaluated under the plain-error rule. Rule 45A, Ala.R.App.P.
Morris specifically takes issue with certain terminology used by the trial court to describe reasonable doubt. He cites to the following language by the trial court: “[A]nd the law means a sound and sensible reason as opposed to some imaginary or fanciful reason”; “[I]t’s not a probability or mere suspicion, it’s not a mere possible doubt because everything relating to human affairs is open to some possible doubt”; “[I]t does not mean a vague or arbitrary notion”; “[I]t’s distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture.” (R. 526.) Morris also argues as improper the trial court’s instruction to the jury that “to convict an innocent person or to acquit a guilty person damages the entire criminal justice system.” As to this last instruction, Morris contends that it improperly suggests that a wrongful conviction is no more harmful than a wrongful acquittal, although the reasonable-doubt standard stands for the principle that “ ‘it is better that a hundred guilty men go free than one innocent man suffer an unjust conviction.’ ” Morris’s brief, at 107, quoting Pruitt v. State, 270 P.2d 351, 362 (Okla.Crim.App.1954.)
“ ‘ “ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ ”
“ ‘Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, “[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).’
“Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003).”
Belisle v. State, 11 So.3d 256, 308 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009.)
A review of the entire reasonable-doubt instruction given by the trial court in the present case reveals that it properly followed the legal guidelines and the Alabama Pattern Jury Instructions in instructing the jury. The trial court charged the jury as follows:
“Now, ladies and gentlemen, the burden of proof in this case is on the State of Alabama as it is in any criminal case. And you say, well, what does that mean. Well, it’s almost a self-defining term. It means a doubt that you can give a reason for. And the law means a sound and sensible reason as opposed to some imaginary or fanciful reason. Sometimes efforts to define beyond a reason *374 able doubt don’t always clarify it. It’s not a probability or a mere suspicion, it’s not a mere possible doubt because everything relating to human affairs is open to some possible doubt.
“A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence. It’s a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but it’s an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination of all of those factors. It’s a doubt that remains in your minds after going over the entire case and giving consideration to all of the testimony and evidence and it’s distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture.
“If after considering all the evidence you’re convinced of the defendant’s guilt beyond a reasonable doubt, it would be your duty to convict the defendant and you should say so. However, after considering all the evidence in the case you have a reasonable doubt of the defendant’s guilt, then you should acquit him and say so in that regard as well.”
(R. 525-26.)
None of the language found objectionable in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339, was used by the trial court in his reasonable-doubt charge.[9] The instruction neither lowered the standard of proof nor was it confusing or deficient.
“The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on ‘a mere guess or surmise’ but must be based on ‘reason and common sense.’ It also informs jurors that reasonable doubt that ‘entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.’ Alabama Pattern Jury Instructions: Criminal, Instructions 1.4 and 1.5 (3d ed.1994). ‘ “ ‘A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.’ ” Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’ Snyder v. State, 893 So.2d 488, 550 (Ala.Crim.App.2003).”
Harris v. State, 2 So.3d 880, 913 (Ala.Crim.App.2007).
Moreover, the trial court did not imply that it is preferable to convict an innocent man than to free a guilty one; rather, it instructed as to the wrongfulness of both. See generally Jackson v. State, 432 So.2d 504, 508 (1983) (holding, without commenting on the charge, that the trial court did not err in failing to charge the jury that “it is better that many guilty people go unpunished than that one innocent person is convicted” because it was an abstract principle of law).
There was no error, plain or otherwise, in the trial court’s instructions to the jury as to the reasonable-doubt standard.
XIII.
Morris alleges that the State improperly introduced victim-impact evi *375 dence during the guilt phase of his trial. Morris refers to evidence that Rochester had a son who was deaf, that she listened to “church” music, and that she had a granddaughter who died of Hodgkin’s disease, that she owned religious jewelry, and that she had a Bible that was “torn up” during the offense. He argues that this evidence unduly inflamed the jury. Morris failed to object to any of this testimony at trial; therefore, this issue is due to be analyzed under the plain-error rule. Rule 45A, Ala.R.App.P.
A review of the record reveals that this testimony had no prejudicial impact on Morris’s trial.
“In Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995), this Court held:
“ ‘It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the defendant] did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [the victim] was not a “human island,” but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).’ ”
Ex parte Walker, 972 So.2d 737, 747 (Ala.2007) (holding no reversible error from introduction of guilt-phase evidence concerning family history, community activity, and character of 87-year-old victim, as well as testimony from a daughter and a friend).
After carefully examining the record, we conclude that the admission of the complained-of testimony did not constitute reversible error.
XIV.
 Morris argues that, during the prosecutor’s questioning of a police officer at trial, the prosecutor improperly commented on Morris’s silence following the appointment of defense counsel. Morris raises this issue for the first time on appeal, and thus this issue is to be analyzed under the plain-error rule. Rule 45A, Ala. R.App.P.
However, the testimony to which Morris alludes could not reasonably have been construed to constitute a comment on his failure to testify. During the direct examination of the officer who had taken Morris’s statement following his arrest and who had interviewed him again later, the prosecutor elicited testimony recounting a number of inconsistencies, deceitful responses, and alterations in the statements given by Morris. The following transpired during this direct examination:
“Q. You talked to him about the jewelry he had on him when he was arrested?
“A. Yes, sir, we did.
“Q. How did he explain how he came to be in possession of that?
“A. Said he won it in a crap game shooting dice.
“Q. Did he tell you any other explanation for it?
“A. He said he had paid ten dollars to a guy for this stuff too. When it all started we asked him where he lived and who he lived with and then he said he paid ten dollars for the stuff, and then later on in the interview he said he won it in a crap game.
“Q. Did he tell you the name of the person he won it from?
*376 No, sir, he did not. i>
Did y’all ask him who? <©
Yes, sir. !>
Did he tell you he didn’t know? <©
Yes, sir. í>
Did y’all ask him about names for any of the people that he got in a fight with? ¿O
Yes, sir. <J
Did he tell you who they were? <3>
By name, no, sir. <4
Did he tell you who he was rolling dice with? &
By name, no, sir. <j
Did y’all talk to him about his time frame for when he was at certain places the night before? &
Yes, sir. í>
Was he able to give you some accurate or specific times? <©
Nothing was specific time-wise.
Could he tell you what time he left his house?
Specific time, no, not by time, no.
Did he tell you what time he ate at the Huddle House?
No, sir. A specific time, no, sir.
Did he give you ages of the guys who he got in a fight with?
Yes, sir.
Do you recall what ages those were?
Eighteen to twenty years old.
Did he tell you anything about being taken back to the crime scene?
No, sir.
Did he tell you anything about seeing crime scene tape?
No, sir. i>
Where did he tell you he thought he was taken after he was arrested? <©
“A. I think he said he went to the fire station, yeah, I think that’s right, and then to Cooper Green.
“Q. Did he tell you that he was with Ron Smith?
“A. No, sir.
“Q. At any point?
“A. No, sir.
“Q. And when was the first time you heard the names Ron Smith or Cue Ball or John Lewis in relation to this case?
“A. About a month ago.”
(R. 470-72.)
Taken in context, the question by the prosecutor was to elicit testimony indicating that Morris had recently formulated a story as part of his defense. The jury would not have understood this question to refer to Morris’s silence following the appointment of defense counsel.
As this Court stated in Connell v. State, 7 So.3d 1068 (Ala.Crim.App.2008):
“We have reviewed the complained-of comment in light of the entire trial, including the defense’s opening argument and the prosecutor’s closing argument. Viewed in that context, the prosecutor was obviously commenting on the appellant’s previous inconsistent statements and on the fact that the evidence did not support the representations defense counsel made in his opening argument. Moreover, the prosecutor’s comment was not ‘ “of such character that a jury would naturally and necessarily construe it as a comment on the defendant’s silence.” ’ Ex parte Davis, 718 So.2d at 1173. Therefore, the appellant’s argument is without merit.”
7 So.3d at 1096. See Barber v. State, 952 So.2d 393, 440 (Ala.Crim.App.2005) (prosecutor’s comment would not have been construed by the jury as a comment on Barber’s silence, but rather was “a permissible *377 comment on the evidence and reply-in-kind to the defense’s implications”).
XV.
Morris argues that his conviction should be overturned because, he says, the trial court improperly admitted gruesome and unduly prejudicial photographs of the victim into evidence. Morris refers to pages in the transcript containing the admission of photographs depicting the victim’s wounds and the crime scene. When the trial court asked if there were any objections to the admission of these photographs, defense counsel responded that he had no objection. Therefore, this issue must be analyzed under the plain-error rule. Rule 45A, Ala.R.App.P.
‘““Generally, photographs are admissible into evidence in a criminal prosecution ‘if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.’ ” Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). “Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.” Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, “photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). “This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.” Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). “ ‘[Ajutopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.’ ” Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). “The same rule applies, for videotapes as for photographs: ‘The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.’ ” Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, “[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence” and “is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.” Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). “Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.” Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).’
*378 “[Brooks v. State,] 973 So.2d [380] at 393 [ (Ala.Crim.App.2007) ].
“Here, the crime scene video was properly authenticated and constituted competent evidence. Despite the gruesome appearance of the crime scene and the victim’s body, the video and photographs of the body and crime scene were properly admitted within the trial court’s discretion.”
Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d —, - (Ala.Crim.App.2009).
In the present case, after viewing the photographs and noting that they were properly authenticated by the witness, we find that they were competent evidence and properly admitted within the trial court’s discretion. There was no plain error as to the admission of the photograph.
XVI.
Morris contends that the trial court deprived him of his constitutional right to ask jurors about their racial bias. Specifically, Morris argues that, because he is a black man and the victim was a white woman, he should have been allowed to submit a written questionnaire to the prospective jurors to ascertain whether they had any racial bias. He argues that the trial court’s decision to prevent him from doing so violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution.
In the present case, the record indicates that there was a thorough voir dire examination of the venire, including group and individual questioning. The trial court did not limit the questioning. Moreover, Morris raises no specific claim or indication of prejudice by a juror who sat on his jury or another member of the venire.
“ ‘In Ex parte Land, 678 So.2d 224 (Ala.1996), the Alabama Supreme Court held that the method of voir dire examination is within the discretion of the trial court and a trial court’s refusal to allow the use of [a] juror questionnaire is not an abuse of that discretion.’ Hodges v. State, 856 So.2d 875, 913 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.2003).” Sneed v. State, 1 So.3d 104, 135 (Ala.Crim.App.2007), cert. denied, 1 So.3d 104 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009.)
Similarly, in Brown v. State, 11 So.3d 866, 885 (Ala.Crim.App.2007), Brown argued “that the circuit court erred in denying his motion to have the prospective jurors complete juror questionnaires related to their qualifications for jury service. [Brown] assert[ed] that voir dire [was] inadequate to uncover prejudices; therefore, he argue[d], it was essential that the jurors complete questionnaires.” In holding that the trial court did not abuse its “broad discretion” by denying Brown’s request for juror questionnaires, this Court noted that Brown pointed to no specific instance where the voir dire had been inadequate to show any prejudices. Id.
In the present case, the trial court did not abuse its discretion in denying Morris’s motion, and there was no indication of any racial prejudice by the potential jurors.
XVII.
 Morris contends that his right to an impartial jury was violated by the striking of two prospective jurors who were opposed to the death penalty.[10]
*379 The record indicates that during the voir dire examination of the venire, the trial court asked if anyone had a fixed opinion either in favor of or in opposition to the death penalty. (R. 21-23.) The two potential jurors whose removal Morris now challenges and who indicated that they held such a fixed opinion were subsequently questioned individually. The trial court and defense counsel questioned the first potential juror, who unequivocally stated that he would never consider the death penalty. The prosecutor moved that the juror be removed for cause, and the trial court granted the motion. Morris did not object. The second potential juror also stated that he would not consider the death penalty under any circumstances. Morris again did not object to the trial court’s granting of the prosecutor’s motion to strike the potential juror for cause. Rule 45A, Ala.R.App.P.
According to § 12-16-152, Ala. Code 1975:
“On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.”
See Rule 18.4(e), Ala.R.Crim.P. (“When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.”).
“Also, ‘ “[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.” ’ McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
“ ‘[t]he test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.” Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’ ” Nettles, 435 So.2d at 153. In Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991), this court held that it was not error for a trial court to deny challenges for cause of two jurors who stated that they knew the victim or her family. One veniremember had been employed as a maid by the victim’s family and the other stated that she knew the victim’s family. Marshall, 598 So.2d at 16. This court held that this relationship was not grounds for a challenge for cause as long as the juror indicates that he or she can be fair and impartial. 598 So.2d at 16.’
“Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).”
Killinqsworth v. State, [Ms. CR-06-0854, November 13, 2009], — So.3d-,(Ala.Crim.App.2009).
*380 The trial court, which is able to view the potential juror’s demeanor as he or she answers the questions posed on voir dire and subsequently if necessary, is in a better position to evaluate his or her beliefs or convictions. In the instant case, these potential jurors’ responses show that their opposition to the death penalty was unwavering and thus would have prevented them from carrying out their duties as fair jurors. There was no error here.
XVIII.
Morris argues that Alabama’s “capital-sentencing statute fails to narrow the universe of defendants eligible for the death penalty.” (Morris’s brief, at 112.) Specifically, he contends that the death penalty is arbitrarily imposed because Alabama allows the factor making certain offenses capital to also serve as an aggravating circumstance in the case. He also again argues that he is being punished twice for the same offense by being convicted of capital murder because it occurred during both a robbery and a burglary. Morris raises these claims for the first time on appeal; therefore, this issue is due to evaluated under the plain-error rule. Rule 45A, Ala.R.App.P.
Morris’s claim concerning the “double-counting” of the aggravating circumstance has consistently been upheld by Alabama appellate courts:
“ ‘ “[W]hen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e); see also Ala. Code 1975, § 13A-5-50 (‘The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.’ Ex parte Trawiclc, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).” ’ ”
Billups v. State, [Ms. CR-05-1767, November 13, 2009], — So.3d -, - (Ala.Crim.App.2009), quoting Barber v. State, 952 So.2d 393, 458-59 (Ala.Crim.App.2005). See also Newton v. State, [Ms. CR-05-1517, October 2, 2009], — So.3d -, -(Ala.Crim.App.2009).
This precise ground of error, that this double-counting fails to narrow the class of death-eligible murderers, has been addressed and determined adversely to Morris by the United States Supreme Court:
“Here, the ‘narrowing function’ was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that ‘the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.’ The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. *381 There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Consti-. tution requires no more.”
Lowenfield v. Phelps, 484 U.S. 281, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
Thus, as this issue has previously been discussed and determined adversely to Morris’s contention, there is no error on this ground.
Furthermore, Morris’s argument that he was improperly convicted of and sentenced based on both murder during a robbery and murder during a burglary is without merit here. See Part II.B. of this opinion. The evidence supported the jury’s finding that Morris broke into Rochester’s home with the intention of committing a theft inside and murdered her in the course of doing so. He also murdered Rochester while overcoming her physical resistance and causing serious physical injury in order to commit the theft. -
Despite Morris’s contention that he could not be convicted and sentenced to both of these capital offenses for the same murder, this argument has also been previously decided adversely to Morris. As this Court stated in Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009):
“Belisle was charged and convicted for two counts of capital murder for murdering Joyce Moore during the course of a burglary and' a robbery, violations of §§ 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. Both require proof of different elements — one a burglary and one a robbery — and do not offend the Double Jeopardy Clause. ‘A defendant can be convicted of two or more capital murders for the death of one victim, so long as those convictions are in accordance with Blockburger [v. United States, 284 U.S. 299 (1932)], i.e., so long as each conviction required an element not required in the other convictions.’ Heard v. State, 999 So.2d 992, 1009 (Ala.2007). See also Ex parte Haney, 603 So.2d 412, 419 (Ala.1992); Ex parte Peraita, 897 So.2d 1227 (Ala.2004); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Castillo v. State, 925 So.2d 284 (Ala.Crim.App.2005); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); White v. State, 900 So.2d 1249 (Ala.Crim.App.2004); Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000); Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999); Burtram v. State, 733 So.2d 921 (Ala.Crim.App.1998); Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998);. Madison v. State, 718 So.2d 90 (Ala.Crim.App.1997); Merriweather v. State, 629 So.2d 77 (Ala.Crim.App.1993).
“Belisle’s convictions for two counts of capital murder for murdering Moore during the course of a burglary and a robbery do not violate the Double Jeopardy Clause.”
11 So.3d at 280. See also Lewis v. State, 57 So.3d 807, 818-19 (Ala.Crim.App.2009).
Because Morris could properly be convicted of both of these capital offenses without violating double-jeopardy principles, and because the evidence supported the jury’s determination of guilt as to these two offenses, Morris’s claim is without merit'.
XIX. .
Morris argues that the trial court erred in allowing a key State’s witness, Detective Russell, to be present during trial. He submits that because the defense had invoked the general exclusion *382 ary rule for witnesses, Detective Russell should not have been allowed to remain in the courtroom.
This issue must be analyzed under the plain-error rule because Morris failed to object to Detective Russell’s presence at trial. Centobie v. State, 861 So.2d 1111, 1130 (Ala.Crim.App.2001), cert. denied, 861 So.2d 1145 (Ala.2008) (“Because the appellant failed to object at trial to the presence of either [the victim’s wife or the Alabama Bureau of Investigation investigator], but merely questioned their presence and whether Rule 615, Ala.R.Evid., had been invoked, this argument is subject to review pursuant to the plain-error rule. See Rule 45A, Ala.R.App.P.”).
“Rule 9.8, Ala.R.Crim.P., states:
“‘(a) Witnesses. Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court.’
“The Committee Comments to this rule establish that ‘The power to exclude and separate witnesses is entirely a matter of discretion with the trial court. Teague v. State, 245 Ala. 339, 16 So.2d 877 (1944); Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958). By invoking the rule, the court is not compelled to exclude all witnesses but may be selective as appropriate.’
“Further, Rule 615, Ala.R.Evid., states:
“ ‘At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party’s cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim’s guardian, or the victim’s family.’
“The Comments to this rule explain that two of the categories which do not authorize exclusion are ‘a party that is not a natural person is entitled to have a representative present. This person is to be an officer or employee of the party and is to be designated by the party’s attorney. Allowing such a witness to be present is consistent with historic Alabama practice. An example of this would be when a police officer, who has been in charge of the state’s investigation, is allowed to remain in the courtroom despite the fact that the officer will be a witness. See, e.g., Portomene v. United States, 221 F.2d 582 (5th Cir.1955).’ ”
Johnson v. State, [Ms. CR-99-1349, October 2, 2009], — So.3d -, - (Ala.Crim.App.2009).
The record establishes that Detective Russell was the chief investigator or “on-call homicide detective” in this case (R. 348-49), and, as such, he was the “official ‘law enforcement representative’ ” and allowed to remain in the courtroom by Rule 615, Ala.R.Evid. Centobie v. State, 861 So.2d at 1130. The trial court did not abuse its discretion in allowing Detective Russell to remain in the courtroom despite *383 the fact that Detective Russell testified at trial. “In Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.1991), the Alabama Supreme Court stated that ‘Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial.’ See also Jackson v. State, 502 So.2d 858 (Ala.Crim.App.1986); Johnson v. State, 479 So.2d 1377 (Ala.Crim.App.1985); Chesson v. State, 485 So.2d 177 (Ala.Crim.App.1983), and authorities cited in those cases.” Id.
Here, the trial court did not abuse its discretion by allowing Detective Russell to remain in the courtroom during the trial. There was no plain error as to this claim.
XX.
Morris argues that Alabama’s method of execution is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution, as well as under the Alabama Constitution of 1901, Art. I, § 15. Specifically, Morris contends that the method of lethal injection used in Alabama could result in excessive and undue pain, because “ ‘[i]t is undisputed that, without proper anaesthesia, the administration of pancuronium bromide and potassium chloride, either separately or in combination, would result in a terrifying, excruciating death. The basic mechanics are that the inmate would first be paralyzed and suffocated (because the paralysis would make him unable to draw breath), then feel a burning pain throughout his body, and then suffer a heart attack while remaining unable to breathe.’ ” Ex parte Belisle, 11 So.3d 323, 338 n. 15 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865,174 L.Ed.2d 582 (2009), quoting Harbison v. Little, 511 F.Supp.2d 872, 883 (M.D.Tenn.2007).
However, in Ex parte Belisle, 11 So.3d at 338, the Alabama Supreme Court held that, in light of the safeguards included in the administration of the drugs used for executions by lethal injection in Alabama, these procedures do not constitute cruel and unusual punishment.
“We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in Travis v. State, 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See, e.g., Sims v. State, 754 So.2d 657, 668 (Fla.2000); State v. Carter, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000); Ritchie v. State, 809 N.E.2d 258, 262 (Ind.2004); Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky.2003). Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.”
Bryant v. State, 951 So.2d 732, 747-48 (Ala.Crim.App.2003), cert. denied, 951 So.2d 732 (Ala.2006), cert. denied, 549 U.S. 1324, 127 S.Ct. 1909, 167 L.Ed.2d 569 (2007). (Footnote omitted.)
XXI.
Morris argues that his conviction and sentence are due to be reversed based on the cumulative effect of the previously alleged errors.
“ ‘ “The Alabama Supreme Court has set forth the cumulative-error rule as follows: ‘[W]hile, under the facts of a particular case, no single error *384 among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App.P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis's substantial rights at trial.” ’
“Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008) (quoting Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006)).”
Brown v. State, 56 So.3d 729, 743 (Ala.Crim.App.2009)
In the present case, when we review the record and the errors previously discussed, there is no indication that they affected Morris’s substantial rights at trial.
XXII.
According to Rule 45A, Ala. R.App.P., we have searched the entire proceedings for any plain error. In so doing, we note that the record of the proceedings does not affirmatively show that the petit jury was sworn as to their oath of service. (R. 107.) However, the case-action summary reflects that the jury was sworn and the record does show parenthetically that the veniremembers were administered their oath before voir dire examination. (C. 47, R. 13.) Therefore, there is no error, plain or otherwise, because of this omission. Ex parte Lee, 989 So.2d 504, 506 (Ala.2008).
Further, pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of Morris’s sentence of death. It is the finding of this Court that there is no error in the sentencing that adversely affected Morris’s rights.
The trial court found the existence of three aggravating circumstances: that Morris had previously been convicted of another felony involving the use of violence to the person, specifically second-degree assault, § 13A-5-49(2), Ala.Code 1975; that Morris intentionally caused the death of Rochester during the commission of first-degree robbery, § 13A-5-49(4), Ala. Code 1975; and that Morris intentionally caused the death of Rochester during the commission of first-degree burglary, § 13A-5-49(4), Ala.Code 1975. The trial court further found the existence of no statutory mitigating circumstances. Moreover, the trial court found that Morris presented no nonstatutory mitigating circumstances at the sentencing hearing, and the trial court found none to be present in this case.
In weighing the aggravating circumstances against the mitigating circumstances, the trial court determined that “[a]fter consideration of all the matters that were presented to [the] Court, the testimony heard at trial, and the sentencing hearing before [the] Court, both in mitigation and by aggravation, taking into account all other matters that were prof-erred before [the] Court,” the aggravating circumstances outweighed the mitigating circumstances. (C. 64.) The trial court’s findings concerning the aggravating and mitigating circumstances are supported by the record.
It is the finding of this Court that death is the proper sentence in this case. After carefully reviewing the record of both the guilt and sentencing phases of Morris’s trial, we conclude that there is no indication that the sentence of death *385 was imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to weigh the aggravating circumstances and the mitigating circumstances independently to determine the propriety of Morris’s sentence of death. An independent weighing of the aggravating and mitigating circumstances indicates that the trial court properly determined that the aggravating circumstances outweighed the mitigating circumstances and that death is the proper sentence.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether Morris’s sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The sentence of death in this case is neither disproportionate nor excessive to the penalties imposed in similar eases, considering the circumstances surrounding both the crime and Morris. See, e.g., Belisle v. State, 11 So.3d 256 (Ala.Crim.App.2007), cert. denied, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009); Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007), cert. denied, 10 So.3d 53 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009.)
For the reasons expressed here, Morris’s convictions and sentences are affirmed.
AFFIRMED.
WELCH and KELLUM, JJ., concur. WISE, P.J., concurs in the result. WINDOM, J., recuses herself.

. It was later determined that Anthony Morris is Morris’s brother and the address that he gave the officer was that of his brother. He also gave his brother’s date of birth when the officers were taking his clothing to be processed.

. Some of the jewelry could not be identified.

. See 851 So.2d at 456 n. 3 for a list of statutes referenced. Moreover, Morrow v. State, 928 So.2d 315, 323-24 n. 8, 9, and 10 (Ala.Crim.App.2004), provides a list of states that have created procedures for determining mental retardation legislatively and judicially and sets out states’ varying requisite burdens of proof.

. During Morris’s testimony at trial, he acknowledged that he was renting from a handicapped man with whom he lived and for whom he shopped and prepared meals. (R. 428-29.)

. It is also notable that although Morris’s sister also testified that he was incapable of cooking a meal, Morris testified at trial that he had cooked breakfast for his landlord and himself on the morning of the offense.

. This Court may take judicial notice of its records in Morris’s first appeal. Lee v. State, 44 So.3d 1145, 1161 (Ala.Crim.App.2009), citing Hull v. State, 607 So.2d 369, 371 (Ala.Crim.App.1992).

. The case-action summary, however, despite the date stamped on the State's motion, reflects that the State filed this motion on November 15, 1999.

. The trial court also stated that it would not allow Morris to give renditions of his out-of-court conversations because he would not be allowed to “make a speech” but rather must "answer questions.” (R. 442.) There was no error in this statement by the trial court. Hodges v. State, [Ms. CR-04-1226, March 23, 2007], So.3d -, - (Ala.Crim.App.2007) (trial counsel was not ineffective for failing to object to the trial court’s instructions to Hodges to “stop making statements” and "simply answer the questions he was asked.” There was also no merit to the claim. "Hodges made an unsolicited comment to the prosecutor, then asked the court if he could make a statement. The trial court is vested with much discretion to control the proceedings in its courtroom and to ensure that proper decorum is maintained.”).

. We note that the trial court did use the terminology "mathematical certainty or beyond all doubt” in its circumstantial-evidence charge. (R. 533.) However, there was no error in that usage. Sharifi v. State, 993 So.2d 907, 933-34 (Ala.Crim.App.2008), cert. denied, — U.S. -, 129 S.Ct. 491, 172 L.Ed.2d 386 (2008.)

. We note that the record indicates that a third potential juror indicated that she had strong feelings about the death penalty but that she was not further questioned as to her beliefs. However, the record shows that neither party had to exercise a strike to remove *379 this potential juror, and she did not serve on the jury.